UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

Patrick Shaw, Debra Shaw, Haley Shaw,
on their own behalf and
on behalf of all others similarly situated,

        Plaintiffs,

        v.

ADVOCATE AURORA HEALTH, INC.
and AURORA HEALTH CARE, INC.

        Defendants.

Case No.   2:24-cv-157

JURY TRIAL DEMANDED

---

## CLASS ACTION COMPLAINT

---

**STAFFORD ROSENBAUM LLP**

Douglas M. Poland (SBN 1055189)
Erin K. Deeley (SBN 1084027)
David P. Hollander (SBN 1107233)
Mason A. Higgins (SBN 1124805)
222 West Washington Avenue, Suite 900
Madison, WI 53703
Tel.: (608) 256-0226
Fax: (608) 259-2600
dpoland@staffordlaw.com
edeeley@staffordlaw.com
dhollander@staffordlaw.com
mhiggins@staffordlaw.com

**HOLWELL SHUSTER & GOLDBERG LLP**

Vincent Levy (4712667)
Gregory J. Dubinsky (5075056)
Kevin D. Benish (5512397)
Byron J. Hazzard (5940754)
425 Lexington Avenue, 14th Floor
New York, New York 10017
Tel: (646) 837-5151
Fax: (646) 837-5150
Email: vlevy@hsgllp.com
gdubinsky@hsgllp.com
kbenish@hsgllp.com
bhazzard@hsgllp.com

**Counsel for Plaintiffs**

# TABLE OF CONTENTS

CLASS ACTION COMPLAINT ..................................................................................... 1

I.  NATURE OF THE ACTION ............................................................................ 1

II.  PARTIES ......................................................................................................... 6

    A.  Plaintiffs .................................................................................................. 6

    B.  Defendants ............................................................................................... 9

III.  JURISDICTION AND VENUE ..................................................................... 10

IV.  OVERVIEW OF HOSPITAL/INSURANCE MARKETS AND CONSOLIDATION .. 10

    A.  Hospital/Insurance Negotiations Within a Functioning Market ............ 10

    B.  Hospital/Insurance Negotiations in a Market Distorted by Anticompetitive Behavior ................................................................................................. 15

V.  RELEVANT MARKETS ............................................................................... 20

    A.  Relevant Product Markets ..................................................................... 21

    B.  Relevant Geographic Markets ............................................................... 23

VI.  AAH'S MARKET POWER ............................................................................ 29

    A.  AAH's Ownership of "Must-Have" Hospitals Provides Its Enormous Market Power ..................................................................................................... 31

    B.  AAH's Ownership of Many Specialty Services in Eastern Wisconsin Increases Its Market Power. ................................................................... 32

VII.  AAH'S ANTICOMPETITIVE CONDUCT ................................................... 33

    A.  AAH Imposes "All Or Nothing" and "All Plans" Contract Language and Uses Other Tactics to Force Inclusion of Its Overpriced Hospitals in Insurance Networks. .. 33

    B.  AAH Punishes Innovative Insurance Products to Suppress Competition. .............. 37

    C.  AAH Engages In "Anti-Steering" and "Anti-Tiering." ........................... 39

    D.  AAH Uses Non-Competes, Referral Restrictions, and Other Tactics To Suppress Competition and Increase Prices. ............................................................ 43

    E.  AAH Uses Gag Clauses to Suppress Competition and Further Its Other Anticompetitive Schemes. ..................................................................... 46

Case 2:24-cv-00157-LA   Filed 02/05/24   Page 2 of 85   Document 1

F. The Combination of AAH's Anticompetitive Conduct is Especially Harmful. ..... 47

G. AAH's Acquisition Strategy Suppresses Competition and Allows AAH to Impose Broader Anticompetitive Contractual Terms. .................................................. 48

VIII. AAH'S ANTICOMPETITIVE CONDUCT CAUSES ARTIFICIALLY INFLATED PRICES AND SUPPRESSES QUALITY. .................................................. 59

A. AAH's Prices Drive Costs for Commercial Health Plans and Their Members. ..... 59

B. AAH Charges Supracompetitive Prices in Milwaukee. .......................................... 60

C. AAH Charges Supracompetitive Prices in Green Bay. ............................................ 66

D. AAH Charges Supracompetitive Prices Throughout Wisconsin. ........................... 67

E. AAH Raised Prices In Illinois Substantially After the Merger. .............................. 68

IX. CLASS ALLEGATIONS .................................................................................................. 69

A. Class Definition .......................................................................................................... 69

B. Certification Requirements ........................................................................................ 70

X. CLAIMS FOR RELIEF ..................................................................................................... 72

COUNT ONE ..................................................................................................................... 72

COUNT TWO .................................................................................................................... 73

COUNT THREE ................................................................................................................. 75

COUNT FOUR ................................................................................................................... 76

COUNT FIVE ..................................................................................................................... 77

COUNT SIX ........................................................................................................................ 79

COUNT SEVEN ................................................................................................................. 80

XI. JURY DEMAND ................................................................................................................ 81

XII. PRAYER FOR RELIEF ..................................................................................................... 81

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs Patrick Shaw, Debra Shaw, and Haley Shaw, individually and on behalf of all others similarly situated ("Commercial Health Plan Members"), bring this action against Aurora Health Care, Inc. and Advocate Aurora Health, Inc. (collectively, "AAH") and state as follows:

## I.      NATURE OF THE ACTION

1.      This is an action for restraint of trade, unlawful monopolization, and unfair methods of competition seeking classwide injunctive relief under the Sherman Act, 15 U.S.C. §§ 1 *et seq.* and Wisconsin's antitrust laws, Wis. Stat. §§ 133.01 *et seq.*, as well as classwide damages under Wisconsin's antitrust laws.

2.      For the past several years, AAH has engaged in anticompetitive methods to restrain trade and abuse its market dominance for the purpose of foreclosing competition and extracting unreasonably high prices from Wisconsin commercial health plans and their members.[1] These abuses include unlawfully forcing commercial health plans to include in their networks all of AAH's overpriced facilities even if they would rather include only some, and aggressively blocking commercial health plans from directing their members to higher value care at non-AAH facilities. AAH has gone to extraordinary lengths to suppress innovative insurance products, such as tiered plans, that would reduce costs for commercial health plans and their members alike. And it has used a combination of acquisitions, referral restraints, non-competes, and gag clauses to suppress competition from other healthcare providers and expand its monopoly over acute inpatient hospital services into other, separate markets. Closely related allegations are made in this District in *Uriel Pharmacy Health and Welfare Plan v. Advocate Aurora Health, Inc.*, No. 22-CV-

---

[1] To the extent the factual allegations are not based on publicly available sources, they are made upon information and belief.

1

610 (LA) (E.D. Wis.), and AAH's motion to dismiss that action was denied in its entirety. *See id.* Dkt. 31.

3.      The supracompetitive prices AAH extracts from Wisconsin commercial health plans are in turn passed on to their members in the forms of higher premium payments, and members directly pay AAH higher deductible, co-pay, and co-insurance payments, resulting in rising healthcare costs in Wisconsin. According to national academic studies and state-specific research in Wisconsin, these rising healthcare costs are primarily driven by the rapidly increasing prices charged by large hospital systems such as AAH, and which in turn are primarily driven by consolidation among hospital providers.

4.      There is a broad consensus among healthcare policy experts that consolidation of hospitals escalates prices without resulting in corresponding increases in the quality of care provided to patients or patient satisfaction. This is because hospital systems with greater market power are able to extract higher prices by engaging in anticompetitive behavior, such as imposing vertical restraints (*i.e.*, the contractual provisions it forces on insurance companies) that leverage the market power they have over one market to extract supracompetitive profits from other markets in which the systems face greater competition.

5.      AAH has used its vast market power to engage in anticompetitive behavior that allows it to charge extremely high prices for commercial health plans and their members in Wisconsin. These prices would not be possible without AAH's anticompetitive behavior and have resulted in Wisconsin commercial health plans and their members overpaying for healthcare by hundreds of millions of dollars in recent years.

6.      AAH's high prices are apparent in routine, high-volume procedures like joint replacements, which at AAH's facilities in Milwaukee cost $21,000 more than at a competitor facility located only minutes away, representing a 50% premium charged by AAH for the same

2

procedure. And they are manifested in cumulative numbers that show AAH is by far the most expensive hospital system in Eastern Wisconsin.

7.     AAH's anticompetitive behavior is a direct contributor to Eastern Wisconsin's high healthcare prices. According to a recent study, healthcare prices in Milwaukee are the fourth highest in the entire country; they are higher even than those in New York City.[2]

8.     AAH has been able to impose these eye-watering prices on commercial health plans and their members in Wisconsin by using its market power to suppress competition. Specifically, AAH:

- Forces commercial health plans to include its overpriced facilities in-network even when they do not want to;

- Goes to extreme efforts to drive out innovative insurance products that save commercial health plans and their members money;

- Suppresses competition on price and quality of care through secret and restrictive contract terms that have been the subject of bipartisan criticism; and

- Acquires new facilities to raise prices for the same services.

9.     Individually and in combination, this anticompetitive conduct results in higher prices paid by Wisconsin commercial health plans and their members. This is true throughout AAH's service area, in the geographic markets in which it has monopoly or near-monopoly power, as well as in markets like Milwaukee where it nominally faces more competition from other hospitals.

10.     The purpose of AAH's vertical restraints (*i.e.*, the contractual provisions it forces on insurance companies) is to inhibit competition, by precluding insurance companies from removing some AAH facilities from their networks and precluding commercial health plans that use those

---

[2] Christopher M. Whaley, et al., *Prices Paid to Hospitals by Private Health Plans: Findings from Round 4 of an Employer-Led Transparency Initiative* (2022).

3

networks from encouraging their members to seek care from nearby cheaper competitor hospitals offering a higher quality of care. If insurance companies and commercial health plans were able to take these actions (or even realistically threaten to), this would lead directly to lower premiums, co-pays, and co-insurance payments. Commercial health plans and their members thus pay substantially more than they otherwise would for healthcare as a direct result of AAH's anticompetitive and monopolistic practices.

11.    In 2019, AAH generated $12.8 billion in revenue and earned close to $1.5 billion in profit. By that same year, AAH had built up about $19 billion in assets. AAH's high profits are a major outlier from other hospital systems.

12.    AAH has used its unlawfully inflated profits to engage in an acquisition spree of competitor hospitals and independent facilities—a spree AAH has made clear it plans to continue in the years to come. These acquisitions offer AAH two self-reinforcing, anticompetitive financial benefits: (1) the ability to impose higher prices at the acquired facilities than the previous owners could, and (2) even greater systemwide power that AAH can leverage to force commercial health plans and their members to pay higher prices at all of its facilities.

13.    As the Milwaukee Business Journal summarized: "Advocate Aurora Health is embarking on what it calls a 'bold new strategy' to more than double its annual revenue by 2025 via mergers and acquisitions of healthcare systems, health insurers and consumer-facing health products." AAH's CEO speculated that the system's profits could be used to acquire more hospitals "a thousand miles away," and AAH's Executive Vice President publicly stated AAH's business practice is to be a "multi-market consolidator."[3]

---

[3] Rich Kirchen, *'Bold' strategy: Advocate Aurora Health plans to more than double revenue by 2025*, Milwaukee Business Journal (January 14, 2020), *available at:* https://www.bizjournals.com/milwaukee/news/2020/01/14/bold-strategy-advocate-aurora-healthplans-to-more.html.

4

14.     And that's exactly what happened in December 2022 when AAH consummated its merger with Atrium Health, Inc. a multi-billion-dollar hospital system based in Charlotte with operations in North Carolina, South Carolina, Georgia, and Alabama.

15.     A previous merger in 2018 combined Aurora Health Care of Wisconsin and Advocate Health Care of Illinois and created one of the largest hospital chains in the country. The merger created the renamed Advocate Aurora Health. The transaction increased both the new system's market power in Southeastern Wisconsin as well as the system's overall leverage over Wisconsin and Illinois commercial health plans who pay for medical services in both states and with the insurance companies that design many commercial health plan networks that must span the Wisconsin-Illinois border.

16.     AAH—a nominal "non-profit"—recently established its own investment and buyout fund in 2021 to engage in further acquisitions, venture capital investments, and other financial transactions where, according to the new fund's president, "there's a lot of growth opportunity." He also stated that the fund would "invest in, acquire, do a transaction with a company where there are synergy or cross-pollination opportunities with our core business." Betraying just how far AAH has strayed from its non-profit status, the "core business" referred to is the supposedly charitable provision of healthcare services to Wisconsin families by AAH. And within that "core business," the buyout fund president was remarkably candid about AAH's goals: "One way we measure that is what we call 'share of wallet,' which is a sort of a retail measure of how many times and in what ways are we interacting with the people we serve beyond just traditional care delivery, and does that generate more revenue?"[4]

---

[4] Health Care Today Law Podcast, *Advocate Aurora Enterprises: Commitment to Whole Person Health*, Foley & Lardner LLP (May 13, 2021), https://www.foley.com/insights/publications/2021/05/advocate-aurora-commitment-whole-person-health.

5

17.     By claiming non-profit status despite being a multistate, multibillion-dollar profitable enterprise, AAH avoids paying hundreds of millions of dollars in federal, state, and local taxes on profits by promising to pursue a primarily charitable purpose. However, a study by the independent Lown Institute released in April 2022 comparing non-profit hospital systems' charitable impact found that AAH spent $498 million per year *less* on charity care and community investment than the estimated taxes AAH avoided through its non-profit, tax-exempt status. This "fair share deficit" at AAH was the eighth worst out of 275 non-profit hospital systems evaluated.

18.     In addition to using profits for an aggressive merger-and-acquisition strategy, AAH pays extraordinary amounts to the executives of this supposedly charitable institution. The CEO of AAH was paid over $13.4 million dollars from the charity in 2019. Over ten of AAH's "non-profit" executives were paid over $1 million in 2019. The "Chief Business Development Officer" was paid over $2.5 million.

19.     Without intervention, AAH will continue to use anticompetitive contracting and negotiating tactics to raise prices on Wisconsin commercial health plans and their members and use those funds for aggressive acquisitions and executive compensation. This will reduce economic growth in Wisconsin, harm patients and taxpayers, and drive employers from the state.

20.     This case seeks to compensate the Commercial Health Plan Members, who have been directly harmed by AAH's past illegal activity, and to enjoin AAH from continuing unlawful practices that harm Wisconsin's economy and healthcare system.

## II.     PARTIES

### A.     Plaintiffs

21.     Plaintiffs Patrick and Debra Shaw (collectively, "the Shaws") are lifelong residents of Wisconsin. They live in Grafton, Wisconsin, where they raised their three children. Patrick works as the Superintendent of The Bull at Pinehurst Farms (also known as Bull Golf at Pinehurst

6

Farms), a nationally recognized golf course in Sheboygan Falls. The Shaws are enrolled in Anthem health insurance, and they receive their coverage through Patrick's employer, with health insurance premiums being covered through payroll deductions from Patrick's earnings. Patrick's health insurance policy also requires the Shaws to pay co-pays, co-insurance payments, and other out-of-pocket expenses directly to healthcare providers up to an annual out-of-pocket maximum of $10,000. In 2023, the Shaws' health insurance cost $1,302.41 per month, of which Patrick and Debra pay $327.41 per month (with the remainder being paid by Patrick's employer, The Bull). Over the years, the Shaws' health insurance premiums have increased steadily. For instance, between 2022 and 2023, their premiums increased by roughly 11%.

22.     For the past decade, the Shaws have received lackluster treatment at high cost from AAH—treatment that has only grown worse as AAH has consolidated its market power. For instance, in or around 2013 Debra lost the ability to receive treatment from her trusted and longstanding primary care physician because her insurance at the time (United Health) changed its policy to require that Debra receive treatment only by AAH doctors and facilities. Unfortunately for Debra, her doctor was not affiliated with AAH.

23.     Patrick's experience with AAH has also been inadequate, in addition to being overly expensive. When he received his first colonoscopy in 2016, he paid zero in out-of-pocket expenses; however, after polyps were detected, Patrick was required to undergo a second colonoscopy in 2019. Patrick's 2019 colonoscopy cost him $4,000 out-of-pocket to AAH, a cost so high that Patrick entered into a monthly payment plan to pay off the debt (which was only satisfied in 2023). Worse still, Patrick was charged by AAH for *two rooms* and *two* anesthesiology fees for the *single* procedure that he underwent. Despite unsuccessfully contesting these charges, AHH contended it could double-charge Patrick for a room because two separate techniques were used to treat him.

7

24.     Patrick's difficulties with AAH have not been limited to arbitrary charges. While seeking treatment at AAH facilities and by AAH staff, Patrick has been subjected to inadequate care. For instance, when Patrick ended up in an AAH emergency room after becoming infected with a serious case of COVID-19 in or around early December 2020, during which time Patrick had extreme difficulty breathing. After check in and initial evaluation, x-rays were taken of his lungs and oxygen was administered. Patrick was then left lying in an emergency bed for hours until – feeling abandoned by AAH staff after no medical professional even bothered to check in on him – he left the AAH facility without ever receiving any further treatment. Weeks later, Patrick continued to have serious breathing problems, so he made an appointment with an AAH pulmonologist, who informed Patrick that his right diaphragm was paralyzed. Despite the extreme stress of the situation, Patrick's doctor did not take the situation seriously. When Patrick pressed for information about his condition, the AAH specialist simply joked that Patrick would find out if his situation worsened because Patrick would no longer be able to breathe. Following this insensitive joke, neither that doctor nor any other AAH staff member ever prescribed precautions or treatments that could reduce Patrick's risk of further harm.

25.     Like Patrick, Debra has recently experienced poor care and incurred substantial out-of-pocket expenses for treatment at AAH. Among multiple incidents, when Debra sought treatment at an AAH facility in 2021 following an injury, she learned that she had a broken bone from an AAH doctor who simply yelled "it's broken" into her room while passing by. A nurse later explained, following Debra's shock and confusion, that Debra suffered a broken tibial plateau. Debra was shocked by the lack of care or concern demonstrated by AAH employees, to say nothing of the treatment she received.

26.     The Shaws' daughter, Plaintiff Haley Shaw, has also suffered incredibly poor treatment at the hands of AAH with significant out-of-pocket costs. Today a resident of

8

Milwaukee, Haley is a teacher in Milwaukee, where she teaches English in the seventh and eighth grades. She has United Health Insurance and pays health insurance premiums, which are deducted from her paycheck. In 2016, at the age of 24, Haley was advised by a physician to seek emergency room services due to an extreme temperature (104 degrees) and pain throughout her neck, lower back, head, and ears. Due to her insurance, Haley visited the emergency department at Aurora Health Center in Grafton on June 20, 2016.  At no time while Haley was there did doctors conduct a physical assessment of Haley's condition or conduct an ontological exam—despite Haley repeatedly complaining about pain in both of her ears.  Haley was sent home by AAH staff after being misdiagnosed with a viral infection.  Due to her worsening condition—and her mother's realization that Haley had never been given a physical exam at the emergency room—Haley was taken back to the emergency room approximately one hour after leaving it. During Haley's second ER visit, she and her mother were belittled by AAH staff about Haley's concerns. Despite finally providing Haley with an examination, AAH staff told Haley that she had fluid built up in her ear, but that this was no cause for concern. It was only after Haley left the AAH emergency room and subsequently sought treatment at a costly walk-in urgent care clinic that she was properly diagnosed with a severe ear infection. Haley was charged approximately $1,000 in out-of-pocket expenses for the inadequate care she received from AAH during this ordeal.

### B.    Defendants

27.    Defendant Advocate Aurora Health, Inc. is a Delaware non-profit corporation with its principal place of business at 3075 Highland Pkwy FL 6, Downers Grove, Illinois, 60515. On April 1, 2018, Advocate Aurora Health, Inc. became the sole corporate member of Advocate Health Care Network, an Illinois non-profit corporation and Aurora Health Care, Inc., a Wisconsin nonstock non-profit corporation. It may be served with process through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801.

9

28.     Defendant Aurora Health Care, Inc. is a Wisconsin non-profit corporation. Its principal place of business is 750 W Virginia Street, Milwaukee, Wisconsin, 53204. It may be served with process through its registered agent at 301 S Bedford St, Ste 1, Madison, Wisconsin, 53703.

## III.     JURISDICTION AND VENUE

29.     This Court has personal jurisdiction over AAH because AAH is a resident of Wisconsin and because the anticompetitive conduct at issue in this litigation took place primarily in Wisconsin. Wis. Stat. § 801.05(1).

30.     This Court has subject matter jurisdiction over Plaintiffs' federal claims under 15 U.S.C. § 15, and 28 U.S.C. § 1331.  The Court has jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because they arise from a common nucleus of operative facts.

31.     Alternatively, this Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) over all of Plaintiffs' claims because the amount in controversy exceeds $5,000,000 and members of the proposed class are citizens of a State different from any Defendant.

32.     Venue is appropriate in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 15 because AAH is domiciled in this judicial district and/or because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV.     OVERVIEW OF HOSPITAL/INSURANCE MARKETS AND CONSOLIDATION

### A.     Hospital/Insurance Negotiations Within a Functioning Market

33.     The market for hospital services is different from other product/services markets because the person consuming the hospital services (the patient) does not negotiate—and in many cases, does not even know beforehand—the prices of the services they are consuming. Nor does the patient typically pay the majority of the costs of the medical services they consume. Instead,

for insured individuals, depending on plan design, a large portion of those costs are paid by their health insurance plans.

34.     Business, local government, and unions may structure their employer-sponsored health insurance plans in one of two ways. First, employers may purchase "fully insured" "off the shelf" commercial health plans from insurance companies, in which companies pay premiums to an insurance company which, in turn, pays most of the bills from hospitals. Second, employers may opt to build their own "self-funded" health plans in which they directly pay the majority of the healthcare expenses of their employees (and their dependents). These "self-funded" or "self-insured" plans rely on insurance companies to help them assemble their networks and handle day-to-day administrative tasks,[5] but they directly pay any remaining balance (after any out-of-pocket costs paid by the members) from hospitals for services used by their employees or dependents. In addition, individuals may also purchase individual commercial health plans directly from insurance companies without going through their employers (this is typically done through the Health Insurance Marketplace operated by the federal government). For simplicity, as members of all three types of insurance products are responsible for out-of-pocket costs in the form of premiums, deductibles, co-insurance payments, and co-pays, this Complaint refers to all three types collectively as "commercial health plans."

---

[5] For both practical reasons and contractual restraints, self-funded plans can almost never assemble their own networks of providers.  They typically rely on large, well-known insurance companies like Aetna, Anthem Blue Cross Blue Shield, and Cigna to act as Network Vendors who allow self-funded health plans to "rent" or access the network they have assembled for their own commercial health plans.  In addition, self-funded plans also typically use insurance companies like Blue Cross or Cigna as Third-Party Administrators ("TPAs") to process claims and manage the day-to-day affairs of the self-funded health plans.  In some cases, a Network Vendor and TPA are two divisions of the same company.  A self-funded health plan can therefore contract with a company both to use its network and to administer the plan.

11

35.     The healthcare market is different from most other markets, where the consumer of the good/service knows the price *ex ante* and chooses to purchase the product based on its cost, quality, and the availability of competing options. Instead, patients, at the direction of their healthcare providers, choose the goods or services, usually without knowing the full price that will be charged for those goods and services.

36.     Before medical services are consumed, hospitals negotiate the prices that commercial health plans and their members will pay for those services with insurance companies. The prices insurance companies negotiate with hospitals for in-network care are called "allowed amounts." When a provider is "in-network" for a health plan—a term that is well-understood by health plan members—the health plan will be accepted by the provider and members' healthcare costs will be determined by plan documents they can consult beforehand. Going to an "out of network" provider generally means much higher costs and uncertainty for both the member (in terms of out-of-pocket costs, frequent surprise bills, and paperwork burden) and their health plan (in terms of substantially higher prices than those offered to plans that include the provider in-network and significant administrative burden).

37.     Insurance companies negotiate with hospitals and other providers to create networks. For a network to be commercially viable (*i.e.*, for it to be one an employer would choose to offer its employees and dependents), it must include enough providers throughout the geography where the network is offered and across the full spectrum of healthcare services patients may need, from primary care to complicated inpatient hospital surgical care to specialty practices.

38.     Insurance companies negotiate with providers on price, attempting to balance the need to build networks with an adequate number of providers and the need to build networks that offer reasonable prices for their potential customers. Insurance companies generally do not negotiate with hospitals on a service-by-service basis. Rather, they generally negotiate with

12

hospitals for bundles of services, which will in turn be offered as "in-network" benefits in their own commercial health plans or self-funded plans that "rent" the network. Once the networks are assembled and incorporated into commercial health plans, the plans generally do not have control over the prices they will be responsible for paying.

39.     If an insurance company and a hospital reach a deal for a bundle of services (for instance, all acute inpatient hospital services), the hospital will generally be considered in-network for every service in that bundle. This means that for any service in that bundle, if a health plan member receives that service from the hospital, the plan will pay the hospital the allowed amount that the insurance company negotiated for that service, after the patient has paid their required out-of-pocket costs.

40.     In competitive markets—markets with multiple hospitals providing the services commercial health plans need or want to offer their members—an insurance company will contract with a hospital for a bundle of services only when the hospital offers services that are competitively priced and of sufficiently high quality. The insurance company may include as in-network only some bundles of services at any given hospital. For instance, the network may designate one hospital as the in-network for all acute inpatient hospital services but may choose not to include that hospital in-network for some acute outpatient hospital services (visits not requiring an overnight stay) because the insurance company has identified ways for commercial health plans to purchase higher quality care and/or less expensive versions of those outpatient services from a nearby competing hospital or other outpatient provider. Similarly, in a competitive market, an insurance company may decline to include any services from a hospital "in-network" if the insurance company determines that the hospital's price or quality of care are not competitive with other nearby providers.

13

41.    If an insurance company wishes to assemble viable networks, the insurance company must construct networks that include a comprehensive bundle of services that members of a commercial health plan can access in their region. Members generally insist on receiving their healthcare near where they live or work. A plan will not be viable if it does not offer in-network services that members commonly desire or need. Similarly, a plan will not be viable if members can receive services at in-network rates only at a hospital that is a long distance from where they live or work because members may not be able or willing to travel so far to receive those services.

42.    In a competitive market, hospitals compete on price and the quality of patient care to be selected by insurance companies for inclusion and preferred placement in networks. Insurance companies in turn compete with one another (1) to offer the best fully insured and individual commercial health plans based on those networks and (2) to have their networks selected by self-funded health plans.

43.    The costs that commercial health plans pay hospitals for in-network services are ultimately passed onto people like Plaintiffs, members of these health plans, in the form of commercial health insurance premiums. Health plan members also pay directly for the costs of medical services provided by hospitals in the form of out-of-pocket expenses such as co-pays or co-insurance. A significant body of academic research has demonstrated that there is a direct connection between higher hospital prices and higher insurance premiums, and that one of the primary drivers of an increase in premiums is consolidation in the relevant hospital market. Thus, the insurance premiums paid by commercial health plan members increase when the plans are forced to purchase services from hospitals at higher rates.

14

**B.    Hospital/Insurance Negotiations in a Market Distorted by Anticompetitive Behavior**

44.    The unique mechanics of the healthcare market provide an opportunity for hospital conglomerates with significant market power to anticompetitively restrain trade through unduly restrictive negotiations and agreements with insurance companies in order to extract supracompetitive prices from commercial health plans and their members. Supracompetitive prices are rates that are higher than what would be found in the context of normal competition. In the market for hospital services, supracompetitive prices come in the form of inflated allowed amounts, which are negotiated by insurance companies and paid by commercial health plans and their members.

45.    When an insurance company seeks to construct a network in a region where a significant geographic area is monopolized by a single hospital system, that hospital system is in effect a "must-have" for the network because the underlying insureds typically expect to be able to (and do) utilize the hospital system closest to their home or place of work. Commercial health plans with a significant number of members in that area will therefore not use a network that does not include necessary services provided by that "must-have" hospital system.

46.    A system with must-have facilities that engages in anticompetitive behavior can cause significant financial harm to commercial health plans and their members. First, in negotiations with insurance companies, a hospital system with must-have facilities can demand allowed amounts that are grossly above what the hospital could obtain if it faced competition. This is true both by virtue of the hospital's extant market power, as well as the enormously high barriers to entry when it comes to many services hospitals provide, such as acute inpatient hospital services. These barriers to entry, which include spending significant time and money to build facilities and hire skilled staff (such as surgeons and anesthesiologists) as well as regulatory hurdles such as obtaining approval from state and local officials before opening a new facility, prevent new

15

entrants from entering the market and reining in prices charged at must-have facilities. Wisconsin imposes detailed regulatory oversight and requires approval of new hospital construction, creating another headwind for new facilities. And Wisconsin has a cap on the total number of hospital beds in the state.

47.     Second, if the must-have facilities are part of a larger hospital system that has other facilities that *do* face competition, the hospital system can refuse to offer in-network services at the must-have facility unless insurance companies also agree to include in their networks the system's other facilities, at higher allowed amounts than those other facilities could normally demand standing alone. When negotiating with insurance companies, a hospital system with must-have facilities can link those facilities to the system's facilities that would normally face more competition, and by doing so extract supracompetitive prices from commercial health plans and their members. Importantly, this results in commercial health plans paying supracompetitive allowed amounts not only for services obtained at the must-have facilities but also for services at the system's "linked" facilities, which face more competition.

48.     These factors and others have led to a consensus in the field of healthcare economics that monopolization of hospital markets significantly increases prices for hospital services. As the Kaiser Family Foundation wrote, "A wide body of research has shown that provider consolidation leads to higher health care prices for private insurance; this is true for both horizontal and vertical consolidation."[6] And the economic literature strongly suggests that there are no concomitant improvements in quality from such monopolization.

---

[6] Karyn Schwartz, et al., *What We Know About Provider Consolidation*, Kaiser Family Foundation (Sept. 2, 2020), https://www.kff.org/health-costs/issue-brief/what-we-know-about-provider-consolidation.

49.     Another anticompetitive tactic used by dominant hospitals to extract supracompetitive rates is the imposition of "anti-steering" and "anti-tiering" provisions in their contracts with insurance companies and health plans. In a competitive market, an insurance company may include both high-cost and low-cost hospitals in network, but individual health plans can take measures (whether directly or indirectly through their TPAs) to incentivize their members to choose the lower-cost, higher-quality provider where possible. These measures can include adding low-cost, high-quality providers to the network, providing truthful information about the cost of care, and offering financial benefits (*e.g.*, lower out-of-pocket costs or more preferential risk-sharing) when members choose lower-cost providers. Such measures undertaken by health plans are called "steering." Another form of steering is the creation of "tiered" networks or "tiered" plans, in which low-cost, high-quality providers are in a higher tier than more expensive and/or lower-quality competitors, and the plan's members are financially incentivized to choose providers in a higher tier by, for instance, requiring a lower co-pay for medical care received from higher-tier providers. This form of steering is often referred to as "tiering." Another form of steering is the creation of "narrow networks," which consist of a subset of all the healthcare providers that participate in a conventional network, typically excluding higher-priced providers.

50.     Academic research by health economists has demonstrated that when commercial health plans are free to engage in steering and tiering, the plans and their members pay significantly lower costs for healthcare, with no corresponding reduction in health outcomes.

51.     When a dominant hospital system—particularly a system with one or more must-have facilities—negotiates with insurance companies, the system can force the insurance companies and commercial health plans using their networks not to engage in these cost-saving measures by requiring "anti-steering" or "anti-tiering" provisions in their contracts. Such provisions essentially require commercial health plans to grant the dominant provider a "most

17

favored nation" status, preventing the plans from favoring other systems through financial incentives, information sharing, or placing any other system in a plan's higher "tier." As detailed below, AAH engages in this anticompetitive conduct.

52.     In 2016, former President Obama's Department of Justice brought a Sherman Act suit against Atrium Health, a dominant North Carolina hospital system that imposed anti-steering and anti-tiering provisions on commercial health plans. *See United States v. The Charlotte-Mecklenburg Hosp. Auth.*, No. 3:16-cv-00311-RJC-DCK (W.D.N.C.). AAH and Atrium have merged into one multistate system in a $27 billion deal. In the lawsuit, the government alleged that the system "prevent[ed] insurers from offering tiered networks that feature hospitals that compete with [the system] in the top tiers, and prevent[ed] insurers from offering narrow networks that include only [the system's] competitors." *Id.* Dkt. 1 ¶ 12. The government further alleged that these and other "steering restrictions reduce competition resulting in harm to Charlotte area consumers, employers, and insurers." *Id.* at 1. The government also alleged that the system had the market power necessary to be able to Force these provisions on unwilling insurers, because the system controlled approximately 50 percent of the relevant market (acute inpatient hospital services). *Id.* ¶ 2. After a federal court held that the system's use of anti-steering provisions was plausibly anticompetitive under the Sherman Act, *id.* Dkt. 46, the case settled, and the system agreed not to impose anti-steering and anti-tiering provisions on commercial health plans going forward.

53.     Former President Trump's Deputy Assistant Attorney General for Antitrust Barry Nigro also criticized anti-steering provisions saying, "Without these provisions, insurers could promote competition by 'steering' patients to medical providers that offer lower priced, but

comparable or higher-quality services. Importantly, that practice benefits consumers, but the anti-steering restrictions prevented it."[7]

54.    President Biden's Secretary of Health and Human Services, Xavier Becerra, wrote in his previous role as California Attorney General that contracting practices that "prevented insurers from using steering and tiering" were among types of "anticompetitive conduct" that "discouraged competition, impaired price-conscious consumer choice, and resulted in inflated prices on a system-wide basis that exceed its competitors and exceed the prices its hospitals and its other providers could charge in a free, competitive market."

55.    Likewise, Senator Chuck Grassley, then chairman of the U.S. Senate Judiciary Committee, said such anti-steering practices were "restrictive contracts deliberately designed to prevent consumers' access to quality, lower cost care."[8]

56.    Because of the nature of the healthcare market being one where the person selecting services (a patient in consultation with their providers) is not the same as the entities paying for the majority of services (commercial health plans), there is a consensus in healthcare policy and economics that these types of restraints – which AAH uses in the form of all-plans, all-or-nothing, anti-steering, anti-tiering, gag clauses, referral restrictions, non-competes, suppression of reference-based pricing (discussed below), and other restraints placed on health plans – block rival providers from their main cost-effective means of competing on cost and quality of care, substantially constrain the choices of consumers and health plans by limiting pricing and quality of care information, remove incentives for new providers to enter the market, bar insurance

---

[7]    Barry Nigro, U.S. Dep't of Just. A Prescription for Competition (May 17, 2018), https://www.justice.gov/opa/speech/deputy-assistant-attorney-general-barry-nigro-delivers-keynote-remarks-american-bar.

[8]    Letter from Sen. Charles Grassley to Joseph Simons, Chair, Fed. Trade Comm'n (Oct. 10, 2018), https://www.judiciary.senate.gov/imo/media/doc/2018-10-10%20CEG%20to%20FTC%20-%20Insurance-Hospital%20Contracts.pdf.

companies from developing lower-cost network options to compete with their rivals, and have other anticompetitive harms detailed below. And because of the nature of the healthcare market outlined previously, these harms to competition take place even if, on paper, consumers still have "choices" among providers. Thus, they foreclose key methods of competition that commercial health plans would normally use (and patients would normally select) to encourage price and quality of care competition between providers.

57. A May 2022 academic study in Health Affairs concluded that tools like reference-based pricing, steering, tiering, and transparency in pricing are particularly important to preserve competition after mergers like the ones AAH has recently engaged in: "In addition to proactive oversight of mergers, acquisitions, and joint contracting, the actions of policy makers, insurers, and employers to empower healthcare consumers with information and incentives to choose lower-cost providers may help mitigate the price effects of consolidation. To this end, employers and health plans have increasingly offered enrollees access to cost transparency tools and benefit designs that include tiered copayments, reference-based pricing, and incentives to seek care at centers of excellence. Such 'steering' mechanisms have been shown to lower costs and put downward pressure on prices." Yet, those specific tools the study identified as important to maintaining competition – reference-based pricing, steering, tiering, and transparency – are the precise tools that AAH has suppressed through the vertical restraints it has forced on insurance companies.

## V. RELEVANT MARKETS

58. Judgment may be entered against AAH for the illegal conduct described in this complaint without defining the particular economic markets that AAH's conduct has harmed. With respect to Plaintiffs' antitrust claims, AAH's ability to impose anticompetitive contract terms in all, or nearly all, of its agreements with commercial health plans and AAH's ability to

persistently charge supracompetitive prices are direct evidence of AAH's market power that obviates any need for further analysis of competitive effects in particular defined markets.

59. Moreover, AAH's ability to control prices in every market in which it operates is direct evidence of AAH's monopoly power, obviating the need to define relevant markets and assess market power indirectly through the use of market shares.

60. Notwithstanding the foregoing, the markets that are relevant to the illegal conduct described in this Complaint are properly defined herein. For each, the product market only includes the purchase of medical services by commercial health plans. The relevant product markets do not include sales of such services to government payers, *e.g.*, Medicare, Medicaid, and TRICARE (covering military families), because healthcare providers' negotiations with insurance companies are separate from the process used to determine the rates paid by government payers.

### A. Relevant Product Markets

61. The primary relevant product markets in this action are the clusters of inpatient and outpatient acute hospital care services offered by AAH. These inpatient and outpatient markets, which are distinct product markets from each other for reasons discussed below, include sales of such services to individual, group, fully insured, and self-funded health plans. AAH sells these services at each of its facilities, although not every facility offers the same bundle of services.

62. *Relevant Product Market #1: Acute Inpatient Hospital Services*. Acute inpatient hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual acute inpatient hospital services are not substitutes for each other (*e.g.*, orthopedic surgery is not a substitute for gastroenterology), insurance companies typically contract for various individual acute inpatient hospital services as a bundle in a single negotiation with a hospital when assembling their networks. Moreover, non-hospital facilities, such as independent outpatient facilities, specialty

21

facilities (*e.g.*, nursing homes), and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services are not viable substitutes for acute inpatient hospital services. Health plans' and consumers' demand for acute inpatient hospital services is generally inelastic because such services are often necessary to prevent death or long-term harm to health. Thus, such inpatient services can be treated analytically as a single product market.

63.     *Relevant Product Market #2: Outpatient Medical Services*. Outpatient medical services encompass all the medical services a hospital provides that are not inpatient medical services (*i.e.*, services that do not require an overnight stay). Although individual outpatient medical services are not substitutes for each other (*e.g.*, a CT scan is not a substitute for an annual physical), insurance companies often contract for various individual outpatient medical services as a bundle in a single negotiation with a hospital system when assembling their networks, and that is how AAH negotiates with insurance companies with respect to outpatient hospital services.

64.     Unlike for acute inpatient hospital services, non-hospital facilities—such as independent primary care providers, specialty facilities, ambulatory surgical centers, nursing homes, and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services—can be substitutes for outpatient medical services provided at a hospital. Consequently, health plans' and consumers' demand for outpatient medical services *from a hospital* is generally more elastic because, if given the opportunity, they could obtain some of these services from non-hospital providers. But demand for outpatient medical services *in general* is inelastic because such services are often necessary to prevent illness, loss of physical mobility, or long-term harm to health. Thus, outpatient medical services can be treated analytically as a single product market.

65.     These two product markets—acute inpatient hospital services and outpatient medical services—are separate. Health plans often purchase outpatient medical services from

22

different providers (*i.e.*, non-hospital providers) than those from which they purchase acute inpatient hospital services, which can only be purchased from hospitals. The existence of non-hospital competitors would, absent anticompetitive behavior, reduce the price health plans and their members would pay a hospital system for outpatient medical services, but those competitors would not affect the price a hospital could charge for acute inpatient hospital services. There are also numerous procedures that can only be performed in an inpatient setting instead of an outpatient setting. The markets are therefore distinct.

## B. Relevant Geographic Markets

66.     Patients generally seek inpatient and outpatient care from hospitals in the areas where they live and work and where their local physicians have admitting privileges. As stated in an FTC study, "In healthcare markets, distance to medical provider is one of the most important predictors of provider choice." Given this, patients do not typically regard hospitals located many miles away from them as substitutes for local ones, particularly when they have little or no financial incentive to travel greater distances. Consequently, an insurance network that does not satisfy patient demand for access to conveniently located hospitals will not be commercially viable.

67.     Hospital Service Areas ("HSAs") are one widely accepted proxy for market definition for inpatient acute care services, developed by *The Dartmouth Atlas of Healthcare.* The Dartmouth Atlas defines HSAs as "local healthcare markets for hospital care" and HSAs are often used in the health care industry to define relevant markets.

68.     In the following HSAs ("***AAH Monopolized Inpatient Markets***"), AAH faces little to no competition, and competition from providers of acute inpatient hospital services located outside these HSAs would likely not be sufficient to prevent a monopolist provider of acute inpatient hospital services located in the HSA from profitably imposing small but significant price increases for those services over a sustained period of time. Indeed, in each of these geographic

23

markets AAH *has* imposed significant, sustained price increases without losing market share, thus satisfying the "hypothetical monopolist" test used to assess the validity of geographic market definitions. For many health plans—and thus insurance companies when assembling networks—AAH facilities in the following areas are considered "must-have" for a network.

69. ***Elkhorn HSA***: In the Elkhorn HSA, AAH controls 66% of inpatient admissions in the HSA.[9] AAH owns the only hospital in Elkhorn, Aurora Lakeland Medical Center. The next nearest hospital for residents of Elkhorn is Mercyhealth Hospital which is not a viable competitor because it lacks certain essential services that Aurora Lakeland offers. For example, dialysis treatment including both hemodialysis (dialysis requiring appointments at a hospital multiple times per week), peritoneal dialysis (self-dialysis done seven days a week), as well as an Extracorporeal ShockWave Lithotripter (the most common way to treat kidney stones) are available at Aurora Lakeland but not Mercyhealth. Additionally, Mercyhealth Hospital has only 25 inpatient beds total, meaning that it would be an entirely inadequate substitute for AAH for plans in Elkhorn HSA. As discussed below, employers and consumers would be unwilling to accept a plan that excluded 72% of all inpatient beds available in the Elkhorn HSA, which would be the result of a network that did not include AAH. Even in the actual small zip code where Mercyhealth is located,

---

[9] This inpatient market share data is primarily based on Medicare admissions or discharges from 2022. *See Hospital Service Area*, Ctr. for Medicare & Medicaid Servs. https://data.cms.gov/provider-summary-by-type-of-service/medicare-inpatient-hospitals/hospital-service-area/data (last visited Jan. 31, 2024). According to the federal government's Centers for Medicare & Medicaid Services (CMS), Medicare data can be "a useful proxy" for evaluating provider market saturation for "private insurance" and academic research has "found market share based on the Medicare discharge data to be representative of all discharges, not just those for Medicare beneficiaries. This is because a hospital's volume of Medicare patients in a given area is associated with its total volume of patients." Furthermore, a review of non-Medicare sources indicates Medicare admissions are useful estimates of market share. For example, a broader State of Wisconsin analysis in 2018 indicated that "the [AAH] System operates ten acute care facilities with a 45 percent inpatient market share" in the "Greater Milwaukee South, Southern Wisconsin, and Northern Illinois Region" – the same percentage of inpatient admissions as Medicare numbers for the Milwaukee HSA.

24

it only accounts for 15% of inpatient admissions, showing that it is simply not a significant check on AAH's monopoly power in the region.

70.      For families living north or east of Elkhorn, both of the closest two hospitals are AAH facilities: Aurora Lakeland Medical Center and Aurora Medical Center Burlington.

71.      The Elkhorn HSA is entirely within Walworth County, Wisconsin.  Wisconsin Physicians Services ("WPS")—a prominent insurance company and TPA—has stated that in Walworth County, "the Aurora network is a necessary component of any health insurance product sold to employers or other groups of *any* size." (emphasis in original). Thus, for the Elkhorn HSA, the AAH network is a necessary component of any network used by commercial health plans in the Burlington HSA.

72.      ***Burlington HSA***. AAH controls over 71% of inpatient admissions in the HSA with significantly over 80% in some portions. AAH owns the only inpatient facility in Burlington, Wisconsin, Aurora Medical Center Burlington. The next nearest inpatient acute care facility for residents of Burlington and nearby towns is about 20 minutes away with no traffic and is another AAH facility, Aurora Lakeland Medical Center. For many residents west of Burlington, the three closest inpatient acute care facilities are all AAH hospitals. To get to a non-AAH facility, a resident of Burlington or nearby towns would need to drive 25 or more minutes (if there is no traffic) to Mercyhealth Hospital, a much smaller facility in Lake Geneva without the inpatient bed capacity for a viable network and without many common hospital services available at Aurora Lakeland Medical Center. For just a few examples, Mercyhealth Hospital does not have a PET scanner, a cardiac catheterization laboratory, cardiac rehabilitation, or an Extracorporeal ShockWave Lithotripter (the most common way to treat kidney stones), all of which are available at AAH's Aurora Medical Center Burlington.  Because of this, Mercyhealth would not be a viable competitor for many services even if it were close enough to compete. Additionally for many residents of

25

Salem Lakes (within the Burlington HSA), the closest three inpatient facilities are all owned by AAH. The nearest non-AAH inpatient facility is 30 minutes or more for most Salem Lakes residents and would involve driving past an AAH facility.

73. As described previously, WPS, a leading insurance company and TPA, has stated that AAH is a must-have system in Walworth County. Walworth County has significant overlap with the Burlington HSA. Walworth County is larger than the Burlington HSA and AAH has a smaller inpatient market share in Walworth County than it does in the Burlington HSA. Therefore, WPS's statements reasonably imply that the AAH network is a necessary component of any network used by commercial health plans in the Burlington HSA.

74. *Hartford HSA:* AAH owns the only inpatient facility in Hartford, Wisconsin and controls 63% of inpatient admissions in the Hartford HSA overall.

*75.* *Marinette HSA:* AAH owns the only inpatient facility in Marinette, Wisconsin and controls about 83% of inpatient admissions in Marinette, Wisconsin and 89% of admissions in Menominee, Michigan. In the HSA overall, which spans the Michigan-Wisconsin border, AAH controls 81% of inpatient admissions. AAH did not build this monopoly through outcompeting rivals on price and quality as our antitrust laws envision. Instead, in mid-2019, AAH purchased the only hospital in Marinette. The next closest hospital for many residents of Marinette or Menominee is Bellin Hospital in Oconto which is over 30 minutes away—absent traffic—and which fails to offer commensurate services. For example, Bellin Hospital does not have many of the birth-related facilities that are available at AAH in Marinette and lacks many facilities and much equipment necessary for intensive care. Thus, Bellin Hospital would be a non-viable competitor for many services even if it was close enough to compete with AAH in this HSA. For other Wisconsin and Michigan communities farther north, the next closest facility after Aurora Medical Center Bay Area is over an hour away. Commercial health plans in both Wisconsin and

Michigan are significant purchasers of inpatient and outpatient services from AAH's Marinette facilities.

76. **_Two Rivers HSA:_** AAH owns the only inpatient facility in Two Rivers, Wisconsin. AAH controls about 73% of inpatient admissions in Two Rivers and over 72% of inpatient admissions in the HSA overall. For many residents of Two Rivers, the next closest non-AAH facility is the smaller Holy Family Memorial Medical Center in Manitowoc, which is about 20 minutes away with no traffic. Furthermore, for residents who live farther north, the two closest facilities are both AAH-owned.

77. **_Sheboygan HSA:_** AAH controls over 64% of inpatient admissions in the Sheboygan HSA and close to 70% of inpatient admissions in parts of Sheboygan. For some residents living south of Sheboygan, the next-closest facility is also an AAH hospital. This increases the market power that AAH has in Sheboygan and areas south of Sheboygan. AAH's market power in Sheboygan is also demonstrated by its ability to control prices, including charging significantly more for inpatient procedures than the other, much smaller inpatient facility in Sheboygan.

78. **_Plymouth HSA:_** AAH controls about 75% of inpatient admissions in the Plymouth HSA.

79. **_Port Washington HSA:_** AAH controls over 76% of inpatient admissions in the Port Washington HSA, primarily due to its ownership of Aurora Medical Center Grafton, the only hospital in Grafton.

80. In all the **_AAH Monopolized Inpatient Markets_** above, AAH's monopoly market power is also reflected in its ability to control prices for inpatient acute care services.

81. In all the **_AAH Monopolized Inpatient Markets_** above, AAH is also a significant provider of outpatient medical services. Through abuse of its monopoly on acute inpatient hospital

27

services, AAH is able to charge supracompetitive prices for outpatient medical services as well, as described in more detail below.

82. In the following HSAs, and in other areas of Wisconsin, AAH faces some competition, yet it is able to impose anticompetitive terms on insurance companies and charge supracompetitive prices for inpatient and outpatient services through anticompetitive conduct. Some examples of HSAs where AAH has been able to charge supracompetitive prices include: Milwaukee HSA, West Allis HSA, Kenosha HSA,[10] Oshkosh HSA, Manitowoc HSA, Oconomowoc HSA, West Bend HSA, Brookfield HSA, Cudahy HSA, Green Bay HSA, Racine HSA, Sturgeon Bay HSA, Waukesha HSA, Chilton HSA, Watertown HSA, Shawano HSA, Fort Atkinson HSA, Berlin HSA, Kewaunee HSA, Fond Du Lac HSA, and Menomonee Falls HSA. AAH has also been able to impose anticompetitive terms in several other HSAs in Eastern Wisconsin, even where AAH controls less than 5% of inpatient admissions.

83. These HSAs, combined with those that comprise AAH Monopolized Inpatient Markets, comprise the ***Relevant Geographic Markets.***

84. In the Milwaukee HSA and nearby HSAs, AAH primarily faces competition from two hospital systems: Froedtert and Ascension. Froedtert's flagship facility is Froedtert Hospital and the Medical College of Wisconsin, and Ascension's flagship facility is Ascension Columbia St. Mary's Hospital. Both have higher safety ratings than AAH's flagship St. Luke's Hospital and both are less than 20 minutes away from St. Luke's. Yet, AAH's inpatient and outpatient prices are dramatically higher than either. As explained below, AAH's supracompetitive prices are due to anticompetitive contracting and its abuse of its market power in other markets to extract rents in Milwaukee.

---

[10] AAH is also a provider for nearby Illinois communities and commercial health plans based in Illinois. For example, AAH controls about 41% of inpatient admissions from Winthrop Harbor, Illinois.

## VI.    AAH'S MARKET POWER

85.    AAH is the largest hospital system in all of Wisconsin and the dominant hospital system in Eastern Wisconsin.  AAH built its substantial market power through acquisitions, aggressive contracting and negotiating, and other anticompetitive tactics.  As explained below, AAH's market power is manifested in its ownership of specific "must-have" facilities, its ownership of specialty facilities, its overall market share, and its ability to control prices.

86.    Demand for the care provided by hospitals (and especially acute inpatient care) is particularly inelastic because care is often necessary to prevent permanent injury or death and generally cannot be obtained from far away geographies.  While per capita demand for healthcare may vary between markets based on demographics (younger communities require less healthcare, for example), the demand within a specific market is much less variable.

87.    Similarly, supply for medical care is particularly inelastic because of the difficulties of constructing new facilities that provided such care (especially acute inpatient care facilities) and the lack of excess capacity (especially acute inpatient care capacity).  Therefore, in a region with only a few large providers of acute inpatient care and a lack of significant excess capacity, it is practically impossible for a large insurance company to indefinitely remove the largest hospital system from its networks; there would simply not be enough alternative inpatient capacity to accommodate all members of health plans using its networks in need of lifesaving care.  And individuals would simply not be willing to enroll in a health plan lacking such a dominant hospital system if there was a risk that changes to a network meant they were unable to receive in-network care nearby because of capacity restraints.

88.    Therefore, unlike in most industries, a hospital conglomerate with anticompetitive goals that controls even a large plurality of inpatient care capacity in a region can force insurers and consumers to accept prices and contractual terms that would only be possible for a monopolist

in other product markets. This is evidenced by the fact that hospital systems in other states with only 40-50% of inpatient market share in a specific market but substantial operations across a region have a documented ability to impose anticompetitive contractual provisions on insurance companies and commercial health plans. For example, the North Carolina system that the U.S. Department of Justice sued for forcing insurance plans to include anti-steering provisions was alleged to have 50% of the market for acute inpatient hospital services. While this is below the normal market-share threshold for monopoly power in other industries, the hospital system nonetheless was able to impose those vertical restraints because, practically speaking, insurance carriers in the Charlotte area could not viably exclude that system from their networks.

89.     Similarly, an employer in the Milwaukee region was told by Network Vendors that AAH is the "dominant player" that is able to force contractual terms on insurance companies, despite the fact that AAH does not have a majority of inpatient or outpatient market share in the Milwaukee HSA.

90.     AAH told a large Network Vendor in the context of a contract discussion that "you need us more than we need you." This indicates that AAH is both aware of its market power and understands it can use that market power to force insurance companies to accept terms they otherwise would not, which it has done in all or nearly all negotiations with insurance companies during the relevant period.

**A.     AAH's Ownership of "Must-Have" Hospitals Provides Its Enormous Market Power.**

91.     Separate and apart from the systemwide market power AAH's total regional dominance gives it, AAH also has market power due to its control of several "must-have" facilities. AAH controls a number of facilities that insurance companies must include in their networks in order to be viable for commercial health plans with significant members living near that AAH facility. AAH hospitals in Burlington, Elkhorn, Hartford, Marinette, Two Rivers, and Sheboygan are "must-have" facilities for many commercial health plans with a significant number of members living near those facilities, and thus are "must-have" for insurance companies seeking to offer or operate plans in those geographies. This is evidenced both by their monopoly-level market share of inpatient admissions in those communities and by the unwillingness of patients to travel long distances for healthcare services.

92.     A hospital system can obtain effective monopoly power for inpatient acute care in geographic markets while holding a smaller percentage of market share than would be needed to achieve monopoly power in many other industries. Many of these reasons are intuitive barriers to entry: enormous financial, legal, and regulatory barriers to entry to building a new competitor inpatient acute care hospital; difficulty of attracting specialized staff in a tight labor market featuring non-competes (including those used by AAH); referral networks and medical records rules that disadvantage new entrants. Others reasons are specific to the inpatient market: Because there is limited excess capacity in most markets for inpatient acute care services (a large percentage of empty beds can drive a hospital out of business) but demand that varies based on external events (seasonal disorders, disease spikes, natural disasters, new substance abuse trends, etc.), it is generally not practical for larger insurance companies to have a hospital system with over 50% of inpatient beds in a specific geographic market out-of-network in the long-term.

93.     These facts are borne out by experience. As noted above, Atrium Health, a system in North Carolina that AAH has merged with, was able to impose anti-steering restrictions on insurance companies despite "only" controlling 50% of the inpatient market. In Wisconsin an

31

insurance company stated that it was not possible to assemble a viable network in a geography that excludes a hospital system with only 50-60% inpatient market share in that geography. Insurers, TPAs, and health plans elsewhere have made similar points about the must-have nature of systems with only 50-60% inpatient market share in other markets, and leading health care economists have concluded that hospitals can have higher market power relative to their market share than other industries. This means that a hospital system with over 50% inpatient market share can have monopoly power and/or be a "must have" system in specific geographic markets.

94.     As explained previously, there are also rural communities—like those in Kewaunee County or northern Marinette County, for example—where reaching a non-AAH inpatient facility would involve the practical impediment of driving long distances directly past an AAH hospital.

95.     As explained below, AAH has explicitly told insurance companies that if they want an AAH facility in any one of their networks, they must include all relevant AAH facilities in every plan using any network. It was possible for AAH to make this demand (and the demand is credible with insurance companies) because (1) AAH owns at least some facilities that it knew insurance companies needed in their networks, *i.e.*, must-have facilities, and (2) AAH has systemwide power throughout Eastern Wisconsin that makes it indispensable to any significant network.

### B.     AAH's Ownership of Many Specialty Services in Eastern Wisconsin Increases Its Market Power.

96.     For some specialized procedures, AAH touts its regional or statewide status as the "only" provider of many of these services. For commercial health plans, that makes the inclusion of some AAH facilities necessary to accommodate particularized health needs.

97.     For example, Aurora Healthcare Centers for Comprehensive Wound Care & Hyperbaric Medicine includes the only center in Washington County offering hyperbaric oxygen

32

therapy. And Aurora St. Luke's, in Milwaukee, is the only hospital in the region with a 24/7 on-site heart-care team. AAH operates the only psychiatric hospital in Sheboygan.

98.     In other cases, an AAH hospital's specialty services may make it difficult for commercial health plans to accept a network that excluded the hospital with those services. For example, one AAH hospital has the equipment necessary for the treatment of most kidney stones whereas the closest non-AAH hospital does not. Members of a commercial health plan who have a history of kidney stones would resist participation in a plan that didn't include the only nearby facility with equipment used to treat kidney stones.

## VII.     AAH'S ANTICOMPETITIVE CONDUCT

### A.     AAH Imposes "All Or Nothing" and "All Plans" Contract Language and Uses Other Tactics to Force Inclusion of Its Overpriced Hospitals in Insurance Networks.

99.     AAH uses its overall market power in Eastern Wisconsin to extract higher prices even at its facilities that face significant competition. If an insurance company seeks to include an AAH facility that it needs to build a viable network, AAH forces the insurance company to also include facilities and outpatient providers that the vendor does not want in its network. On information and belief, AAH has done so in all or nearly all of its negotiations with insurance companies during the relevant period, thus affecting the vast majority of the market.

100.     According to a *Milwaukee Journal Sentinel* investigation in late 2018, "The variation in prices also has drawn attention to 'all-or-nothing' clauses that require health plans to include all of a health system's hospitals in a network and that bar health plans from placing the hospitals in a tier that requires higher cost-sharing. Aurora Healthcare, now part of Advocate Aurora Health, has long had those clauses in its contracts."[11] Such all-or-nothing clauses are a

---

[11] Guy Boulton, *Health Care Prices in the Milwaukee Area Overall Are 17 Percent Above the National Average*, Milwaukee Journal-Sentinel (Nov. 8, 2018), https://www.jsonline.com/story/money/busi

vertical restraint that AAH has imposed on insurance companies like Anthem, UnitedHealth, Cigna, Quartz, Common Ground Healthcare, Trilogy, Aetna, Humana, and others, and which these insurance companies would not agree to but for AAH's demand that they do so.

101. AAH has gone as far as to sue health plans that attempt to only include some of its hospitals in their networks for violating the all-or-nothing clauses that AAH forces insurance companies to accept in their contracts. In a suit that was confidentially settled in 2007, AAH stated that its contracts require that all AAH facilities be included in all of an insurance company's commercial health plans or none of them can be. AAH sued WPS, a commercial health insurer and Network Vendor, for "operating and marketing of plans without Aurora providers in violation of our agreement."

102. According to that AAH contract, WPS agreed to "Identify all AURORA Participating Providers as Participating Preferred Providers in all WPS Plans within Aurora's defined service area of Eastern Wisconsin." Therefore, not only does AAH force "all-or-nothing" contract language on insurance companies for any given plan—it also insists that even if an insurance company needs to include just one AAH provider in one network, the insurance company must include all AAH inpatient and outpatient providers in *every plan* it offers, including all networks offered to self-funded commercial health plans. This "all-plans" condition is a vertical restraint that enables AAH to extract supracompetitive rents even in markets where it does not have a dominant market share. And AAH makes its "all-plans" condition clear in the definitions appendix to its contracts: The WPS/AAH contract stated explicitly that "'Plan' shall include individual health insurance policies, group health insurance certificates issues by WPS and self-insured plans administered by WPS," meaning that the exact same restraints applies to the

_____

ness/health-care/2018/11/08/health-care-prices-milwaukee-green-bay-well-above-national-average/18 89248002.

insurance company if it sells its network to other commercial health plans or if it operates its own commercial health plan. On information and belief, AAH continues to use similar contract language and has used such language in contracts with most insurance companies during the relevant period. Insurance companies would prefer not to include the all-plans restraint in their contracts with AAH, but AAH is able to force them into accepting the term due to its market power.

103. But for AAH's all-plans requirement, insurance companies would develop plans that did not include AAH (or at least did not include all of its facilities) in-network, which would force AAH to compete with rival providers on price and quality of care. By eliminating that method of competition, AAH has substantially foreclosed competition in the relevant markets.

104. This foreclosure is substantial, moreover, because AAH has forced all or nearly all insurance companies to accept its all-or-nothing and all-plans restrictions. According to WPS, AAH forces all or nearly all insurance companies to agree to the same all-or-nothing terms, and "every other major health insurer with which Aurora has contracted, including United Health Group, Inc., WellPoint Health Networks, Inc., Humana, Inc., Aetna, Inc., and others, has been forced to accede to Aurora's anticompetitive interpretation of the all-plans requirement, regardless of the specific text of that requirement in their respective contracts." "Others" clearly refers to other smaller insurance companies than those named, which includes Cigna, Trilogy, Common Ground Healthcare, Quartz, and other Wisconsin-specific insurance companies. Thus, these vertical restraints have foreclosed a substantial amount of commerce in AAH's service area. AAH's forced imposition of the all-plans requirement on just the entities named by WPS represents a restraint that has foreclosed competition for in vast majority of the health insurance market in Eastern Wisconsin.

105. AAH treats these all-or-nothing and all-plans clauses as non-negotiable and forces them on insurance companies. A consultant who has negotiated contracts with AAH stated that

35

AAH's negotiating posture on its anticompetitive contractual terms is, "you either sign it or we don't do business."

106.    A 2006 report by the *Milwaukee Journal Sentinel* noted that, "Aurora's contracts go further [than most hospital systems]: They generally require Aurora hospitals to be included in every health plan offered by an insurer or administrator." An August 2022 analysis of AAH's currently accepted insurance coverage materials and of several insurance companies listed in-network providers indicates that AAH appears to have an all-plans requirement on nearly all insurance companies. Additionally, an analysis of several major insurance companies—including WPS, Trilogy, Cigna, and others—indicates that insurance companies continue to either include all overpriced AAH facilities in all their networks/plans or none in any. This structure is contrary to the economic interest of commercial health plans and cannot be explained absent AAH's contractual restrictions like its all-plans requirement.

107.    By virtue of its overall market power and/or its market power over acute inpatient hospital services in certain key regions, AAH can and does impose its all-or-nothing and all-plans conditions to force insurance companies (and by extension commercial health plans) to include outpatient medical services in their networks at supracompetitive rates. For example, AAH cancelled its entire contract with an insurance company because, according to AAH, the insurance company sought a "carve-out" for radiology. In a competitive market and absent AAH's restraints, insurance companies and commercial health plans would normally use these kinds of carve-outs to encourage members/employees to seek lower cost outpatient care from non-AAH providers. But AAH forces its all-or-nothing and all-plans vertical restraints on insurance companies and commercial health plans to suppress this type of competition.

108.    These terms are forced on insurance companies who have to accept them because of AAH's market power. As WPS, a prominent insurance company, wrote, "If Aurora had not

36

possessed market power sufficient to condition WPS's access to those markets upon WPS's acceptance of the Agreement's anticompetitive terms and conditions, WPS would not have signed the Agreement."

**B.      AAH Punishes Innovative Insurance Products to Suppress Competition.**

109.    AAH has also aggressively used its market power to suppress the introduction of innovative insurance products in Wisconsin. Absent AAH's successful efforts to foreclose the entrance of these cost-saving products, commercial health plans and their members in Wisconsin would be paying significantly less for health care.

110.    For example, effective October 1, 2020, AAH implemented a "policy" conveying to insurance companies that it refuses to accept payment from or even submit claims to health plans that use "reference-based pricing." Health plans that use reference-based pricing base their payments to hospital systems on a percentage above the hospital's Medicare rates.[12] Plans with reference-based pricing allow hospitals to make a significant profit but limit the ability of hospitals to charge supracompetitive prices relative to an accepted and government approved baseline (*i.e.*, the Medicare rate, which itself is calculated to ensure a hospital makes a profit on each service). These plans also promote competition by encouraging providers to compete on the basis of their price relative to a well-established baseline.

111.    In addition to pressuring insurance companies and commercial health plans to avoid using innovative plans, AAH in practice turns down payment checks sent from health plans using reference-based pricing. On information and belief, AAH forgoes immediate profit because it

---

[12] AAH itself makes a profit on Medicare's rates, as detailed in recent comprehensive, independent research that evaluated hospital profitability.  Reference-based pricing plans pay a large percentage above Medicare's rates.

seeks to make these plans non-viable in the areas where AAH operates. Thus, AAH is consciously forgoing profit in the short term to achieve its long-term goal of suppressing competition.

112.    And AAH has created specific administrative burdens for the members of plans using reference-based pricing, including refusing to provide standard forms and documentation. On information and belief, this action was taken to prevent members from accessing their plan benefits in order to undermine innovative plans.

113.    AAH has also conveyed to representatives of a self-funded plan that it will not directly negotiate with the plan, creating another barrier to innovative insurance products.

114.    In another example, in 2008 AAH allegedly pressured an insurance company to stop doing business with a TPA and health plans that AAH disfavored. AAH then falsely told members of plans administered by that TPA that they would be refused service by AAH providers, even if they were existing patients of AAH. On information and belief, AAH engaged in this and other extreme measures that in the short term appear economically irrational and harmful to AAH's reputation with the goal of eliminating innovative insurance products from the Eastern Wisconsin area. And, on information and belief, the insurance company agreed to AAH's demand to cancel a lucrative contract with a health plan only because of credible threats from AAH to use its market power to punish the insurance company more broadly. Since then, AAH's market power – and therefore its ability to impose such restraints on insurance companies – has grown substantially. And it has continued forcing these restraints on them.

115.    AAH has taken other efforts to punish insurance companies attempting to offer innovative insurance products. In one example, AAH sought to punish a network that did not include AAH facilities; in response to the creation of a narrow network that excluded AAH, AAH created a new insurance product that would cover the costs for members of the narrow network who used AAH's "out-of-network" facilities for only $20. This scheme, which effectively amounts

38

to predatory pricing, would eliminate the incentives for members of plans using the narrow network to visit lower cost non-AAH providers. An insurer alleged that AAH was offering a money-losing product with the intent of eliminating the narrow network: "It's clearly a proposal not designed to be self-sufficient." This is another way AAH appears to engage in non-economic decision making for the purpose of suppressing competition.

116.    Given that many employers wish to use reference-based pricing and that they would significantly reduce what they and their members pay for healthcare, AAH's refusal to accept payment from such plans and discrimination against them forecloses a substantial amount of competition.

**C.    AAH Engages In "Anti-Steering" and "Anti-Tiering."**

117.    During the relevant time period, AAH forced most insurance companies to accept anti-steering and anti-tiering provisions in contracts that prevent insurance companies from designing networks or commercial health plans that would result in expanded choice and/or significant cost savings.

118.    Through its coercive contracting practices, AAH deliberately limits the use of tiering by commercial health plans in order to lessen the competition it faces from rivals offering lower prices and higher quality.

119.    Anthem, one of the largest insurers and Network Vendors in Wisconsin, told a local self-funded health plan that "due to their contracts with the dominant player, which is Aurora," it was barred from allowing local employers to offer tiered health plans that would incentivize employees to seek out lower cost, higher quality care. Through this action, AAH forced commercial health plans to pay AAH's supracompetitive rates more often than they would have otherwise.

39

120.     UnitedHealthcare, also one of the largest insurers and Network Vendors in Wisconsin, told the same health plan that they were barred by AAH from allowing local employers to offer tiered health plans that would incentivize employees to seek out lower cost, higher quality care. Through this action, AAH forced commercial health plans and their members to pay AAH's supracompetitive rates more often than they would have otherwise.

121.     Notably, AAH's ability to force two of the country's largest insurance companies to accept such onerous, anticompetitive terms is itself evidence of the dominant market power AAH enjoys throughout its entire service area, thus foreclosing the competition that steering would create throughout all or nearly all of the market.

122.     Indeed, the restraints AAH imposes on insurers foreclose competition in a significant portion of the market, when measured by the market shares of the insurance companies AAH has coerced into accepting these restrictive terms. Anthem and UnitedHealth control 69% of the commercial health insurance market in Greater Milwaukee-Waukesha (which includes the Milwaukee HSA, West Allis HSA, Hartford HSA, Port Washington HSA, parts of the Oconomowoc HSA, parts of the West Bend HSA, the Cudahy HSA, the Menomonee Falls HSA and the Brookfield HSA); 62% of the commercial health insurance market in Greater Sheboygan (which includes the Sheboygan HSA and the Plymouth HSA), 52% of the commercial health insurance market in Greater Green Bay (which includes the Green Bay HSA and the Kewaunee HSA); and 57% of the commercial health insurance market in Greater Oshkosh-Neenah (which includes the Oshkosh HSA and parts of the Berlin HSA). As noted above, similar restrictions have been placed on WPS, which controls at least 2% of the statewide health insurance market (higher in Eastern Wisconsin since several WPS networks are not sold in Northwestern Wisconsin). And other data indicates that Anthem, UnitedHealth, and WPS combined control about 50% of the insurance market statewide with a higher percentage in Eastern Wisconsin, covering all Relevant

40

Geographic Markets. WPS also stated that it and "every other major health insurer with which Aurora has contracted, including United Health Group, Inc., WellPoint Health Networks, Inc., Humana, Inc., Aetna, Inc., and others, has been forced to accede to Aurora's anticompetitive interpretation of the all-plans requirement, regardless of the specific text of that requirement in their respective contracts."

123. Thus, AAH's documented imposition of its anticompetitive restraints on Anthem, UnitedHealth, and WPS foreclose competition in substantially over 55% of the health insurance market in all Relevant Geographic Markets in Eastern Wisconsin (and over 70% in the Milwaukee HSA and other nearby HSAs). And the actual foreclosure percentage is much higher based on WPS' statements and other evidence indicating that AAH's restrictions are also imposed every other major health insurer, including Aetna, Humana, WellPoint, Common Ground Healthcare, Trilogy, Cigna, and others. These insurers collectively provide health insurance to the vast majority of Wisconsinites, and they are prevented by AAH from using normal incentives and innovative insurance products to encourage competition among healthcare providers. AAH's conduct has thus foreclosed a substantial amount of competition.

124. Another way AAH limits tiering is by insisting that it be in the top tier of any tiered plan, even if it is a low-value provider relative to others. For example, in a review of several large national and regional commercial health plans, AAH facilities are all listed in the top tier despite being higher-cost than nearby competitors. This can only be explained by AAH forcing insurance companies to include its facilities in a plan's top tier, regardless of price or quality—thereby defeating the purpose of creating a tiered plan in the first place. This results in commercial health plans and their members paying AAH's supracompetitive prices more often than they would absent AAH's conduct.

41

125.    AAH forces commercial health plans to include AAH in the top tier by threatening that it would otherwise not allow any AAH facilities or outpatient providers to be included in the plan at all, which would make the plan non-viable in many key markets. An AAH contract specifically states that for any plan offered by a TPA, the plan "shall . . . [i]dentify all AURORA Participating Providers as Participating *Preferred* Providers" (emphasis added).  Member opts out of Tier 1 status or participation in such product offerings."  The intent and practical impact of these clauses is to limit the ability of health plans to honestly communicate about the availability of lower-cost, higher value care available at non-AAH providers in Wisconsin, causing commercial health plans and their members to pay AAH's supracompetitive prices for care more often than they would absent AAH's conduct. These provisions also block rival providers from a primary cost-effective means of competing on price and quality since AAH bars insurance companies from rewarding rival providers that offer higher value services with a higher tier than AAH.  And they undermine insurance companies and TPAs' attempts to develop lower-cost tiered network options to compete with their rivals.

126.    AAH also engages in other kinds of anti-steering and exclusionary conduct that prevents insurance companies from designing networks that would result in expanded choice and/or significant cost savings for commercial health plans and their members. For example, AAH has in the past prevented an insurance company that wanted to direct patients to non-AAH radiology centers (presumably because of their lower cost) from accessing any of AAH's network. Based on AAH's uniform imposition of other restrictions like anti-tiering and all-or-nothing on all or nearly all insurance companies, on information and belief, AAH imposes these same types of anti-steering and exclusionary provisions on all or nearly all insurance companies including Aetna, Cigna, Humana, Trilogy, Common Ground Healthcare, Wisconsin Physicians Service, United Healthcare, Quartz, and others.

127.     In addition to undermining the tiered commercial health plans that do exist, AAH's aggressive anti-tiering practices also mean that insurance companies will decline to introduce tiered networks in the first place because they would serve little purpose in a market where AAH is a major provider. For example, Trilogy, Cigna, Wisconsin Physician Service and other insurance companies do not offer tiered networks in AAH service areas despite some of them offering tiered plans outside of AAH's service area. This results in commercial health plans and their members (including Plaintiffs) paying AAH's supracompetitive prices more often than they would in a competitive market with more tiered plans.

128.     Because steering practices and tiered plans are a common cost-saving tool that most insurance companies would engage in absent AAH's restraints, AAH's conduct prohibiting purchasers from engaging in this conduct forecloses a substantial amount of competition.

**D.     AAH Uses Non-Competes, Referral Restrictions, and Other Tactics To Suppress Competition and Increase Prices.**

129.     AAH has forced physicians to agree to onerous non-compete agreements that limit their ability to work for other hospital systems in Wisconsin or to open independent practices. This anticompetitive practice drives up prices for commercial health plans and their members because it precludes numerous potential lower-cost independent providers from operating. It also increases prices by artificially creating a tighter labor market for physicians, creating an impediment to rival hospital systems opening new locations to compete with AAH.

130.     AAH's non-competes have been found by a Wisconsin court to be unlawful.

131.     For example, in one case, AAH attempted to enforce an aggressive non-compete against a family practice physician.  Family practice is a very competitive market where providers compete for patients. It also is a practice that can generate a significant amount of business for a hospital due to referrals.

43

132.    In this instance, AAH attempted to enforce a non-compete to prevent a family practice doctor from practicing, even though the non-compete only covered urgent care. Despite the physician not having provided urgent care in decades, AAH sought to bar them from practicing even in a different field. The Milwaukee County Circuit Court found AAH's non-compete provisions unenforceable.

133.    AAH's non-competes have eliminated or suppressed competition in the family practice market and, on information and belief, the same type of non-competes have eliminated or suppressed competition in other outpatient services.

134.    AAH also forces onerous non-competes on physicians it acquires from other practices. For example, as part of its abandoned effort to purchase a hospital chain in Michigan, AAH insisted that many doctors of the acquired hospitals would be required to sign a non-compete preventing them from working for any other hospital system within 35-miles for at least three years. The long duration and broad geographic limitations of such coerced non-competes result in substantial reductions in competition in markets where AAH acquires facilities by preventing the entry of new provider competitors and limiting the options for members of commercial health plans to seek higher value care at non-AAH facilities.

135.    A medical professional who has worked at both AAH and Froedtert remarked in an online post that AAH "is known for problematic non-compete agreements."

136.    Beyond non-competes, AAH also forces anti-competitive terms on independent physicians who work in its facilities.

137.    For example, according to a 2013 lawsuit, in an apparent effort to punish independent physicians who do not agree to directly affiliate with AAH, AAH instituted a policy that required 24-hour a day, 7-day a week continuous call coverage for independent physicians and then denied the independent physicians the ability to seek backup call coverage from another

44

physician. If independent physicians did not agree to these "nearly impossible conditions," AAH would refuse to renew medical staff privileges. Meanwhile, AAH's own employed physicians were allowed to exchange call coverage or seek backup call coverage.

138.    According to a local physician, this policy encouraged the "systematic elimination of independent physicians by Aurora" and "reduced the overall output of family practice physicians for patients" in the Oshkosh market.

139.    The American Academy of Family Physicians criticized AAH's policy saying it was "unreasonable and contrary to good practices and federal law."

140.    Moreover, in 2018, AAH agreed to settle claims that it illegally overpaid two physicians so that they would keep referrals within the AAH system.

141.    AAH has engaged in other practices to aggressively limit physicians from referring outside of the AAH system to competitors. For example, during an acquisition of a group of outpatient providers, AAH insisted that, as part of the acquisition, it be able to impose a provision that would require the acquired providers to "exclusively" refer to AAH facilities. And as a Wisconsin newspaper columnist wrote, more broadly, "Aurora Health Care has set the standard by buying up physician practices and clinics and forcing doctors to send patients to Aurora's hospitals." These practices drive up costs and reduce quality for commercial health plans and their members by preventing physicians from referring patients to the highest value care. And they limit the ability of independent specialty providers to compete by cutting off a source of referrals. This coercion of physicians to force referrals to overpriced AAH hospitals is an abuse of AAH's market power that raises prices for commercial health plans and their members and is another way AAH forecloses competition.

142.    Because absent AAH's anticompetitive conduct independent physicians would compete for patients and would assist other hospitals in competing for referrals, AAH's restrictions have foreclosed a substantial amount of competition.

**E.    AAH Uses Gag Clauses to Suppress Competition and Further Its Other Anticompetitive Schemes.**

143.    AAH insists on strict gag clauses with insurance companies that limit their ability to disclose anticompetitive contract terms to commercial health plans. These gag clauses have also been used by AAH to prevent commercial health plans and their members from knowing the price for AAH's services before the provision of care. This directly suppresses price competition.

144.    The Wall Street Journal identified AAH as among several hospital systems in the United States that use "secret contract terms" to prevent transparency on prices and quality.[13]

145.    In properly functioning markets pricing information is freely available, allowing purchasers to determine the prices they will be obligated to pay their suppliers if they purchase the suppliers' products and services. The ability to determine the amount of the purchase price before the purchase decision is made allows the customer to compare the prices offered by various competitors and allows the purchase decision to be influenced by price competition.

146.    AAH has required terms in its agreements with insurers that forbid them from disclosing the allowed amounts that AAH has negotiated for the healthcare services and products offered to commercial health plans and their members. An insurance company in Wisconsin stated that negotiated prices between insurers and AAH are, "a closely guarded secret" and "subject to confidentiality restrictions" in AAH's contracts. AAH's gag clauses also forbid disclosure of other, non-price terms.

---

[13] Anna Wilde Mathews, *Behind Your Rising Health-Care Bills: Secret Hospital Deals that Squelch Competition*, Wall St. J. (Sept. 18, 2018), https://www.wsj.com/articles/behind-your-rising-health-care-bills-secret-hospital-deals-that-squelch-competition-1537281963.

147. On information and belief, these gag clauses are partially intended to prevent knowledge or scrutiny of other anticompetitive contracting terms like all-or-nothing, all-plans, anti-tiering, anti-steering, and contract termination penalties.

148. Because AAH's gag clauses prevented commercial health plans and their members from determining what they will be obligated to pay AAH for healthcare services (and how much those prices exceed the prices charged by AAH's nearby competitors), commercial health plans are less able to exert commercial pressure on AAH to moderate its inflated pricing by sending members to other providers.[14]

149. AAH's use of gag clauses and other anticompetitive terms has effectively undermined price competition for healthcare in the Wisconsin markets AAH serves and foreclosed a substantial amount of competition. These gag clauses also substantially reduced AAH's rivals' incentives to compete on price because a rival providing a lower price product will not necessarily attract consumers to select the rival's product if consumers are barred from knowing the price of AAH's products relative to the rival.

## F. The Combination of AAH's Anticompetitive Conduct is Especially Harmful.

150. AAH's market power aggravates the anticompetitive nature of its contracting and negotiating tactics. The forced imposition of all-or-nothing and all-plans conditions, as well as anti-tiering and anti-steering provisions is problematic any time it is imposed on insurance companies and commercial health plans by a dominant provider, because each such contractual term limits the ability of commercial health plans and their members to competitively select

---

[14] These provisions also inhibited insurers' ability to offer cost-efficient products for commercial health plans because AAH's gag clauses prevented insurance companies from knowing anything about the *relative* prices they are negotiating. On information and belief, while discussing AAH's contracts, an insurance company in Wisconsin said that knowing its own negotiated rates are only useful, "assuming it can learn something about its competitors' deals with that same provider." AAH's gag clauses foreclosed that relative comparison and the competition that would result.

healthcare options. However, in the context of a hospital system with both significant market power and monopoly facilities, these contract provisions have an especially harmful impact on price and quality. This is particularly true—and such restrictions are particularly anticompetitive—when they are forced on nearly all insurance companies in the region, against their will. That is exactly what AAH has done.

151.    Importantly, each of AAH's anticompetitive restrictions on insurance companies and commercial health plans cause greater harm in concert than any individual vertical restraint would in isolation. For example, if AAH engaged only in all-or-nothing contracting but did not impose anti-steering, anti-tiering, or gag clauses on insurance companies, commercial health plans could at least mitigate harm caused by AAH's tying schemes by incentivizing their members to obtain in-network care from one of AAH's competitors. Thus, while each contractual restriction described herein is unlawful in isolation, taken together their impact is especially harmful to commercial health plans and their members as well as to AAH competitors.

### G.    AAH's Acquisition Strategy Suppresses Competition and Allows AAH to Impose Broader Anticompetitive Contractual Terms.

152.    AAH has gone on an aggressive acquisition spree that increases its market power and the leverage it holds over insurance companies and commercial health plans. In 2020, AAH's CEO touted a "bold new strategy" to double AAH's annual revenue by 2025 via mergers and acquisitions. AAH's Executive Vice President actually publicly stated that AAH's intention is to be a "multi-market consolidator."

153.    This acquisition strategy has several self-reinforcing anticompetitive benefits for AAH.  First, AAH is able to impose higher prices at facilities it acquires than the previous owner because of its use of the anticompetitive contracting terms described above. After AAH takes over a new facility, it employs the anticompetitive contracting terms described above in negotiations with insurance companies at the newly acquired facility. For example, during a proposed AAH

48

takeover in Michigan, Crain's Detroit Business summarized the arguments from AAH's CEO as: "Advocate Aurora wants Beaumont's physicians to expand its managed care contracting strategy with payers and employers to Michigan."[15] A May 2022 study supports the idea that affiliations and acquisitions of independent physician practices—like those AAH has aggressively engaged in—raise prices: "We found strong evidence that vertical integration and joint contracting between physicians and large health systems during 2013–17 led to large increases in physician prices, particularly for primary care physicians.  Our findings complement a literature that has found increases in physician prices associated with hospital acquisitions of physician practices."

154.    Second, the newly acquired facilities further increase AAH's leverage with insurance companies and commercial health plans, thereby reinforcing AAH's ability to force insurance companies and commercial health plans to accede to anticompetitive contracting terms. As the CEO of AAH stated in 2020: "Every time we've scaled up, we've gotten stronger."[16]

155.    Third, AAH leverages its market power to force newly acquired physicians and facilities to refer to AAH, depriving health plans of the benefit of having their members referred to the highest value provider and suppressing competition by eliminating a source of revenue for AAH competitors. AAH executive Pat Trotter was explicit that AAH aims to "leverage" its overall market power to control referrals in new markets it enters. The Appleton Post-Crescent described AAH's public statements: "Aurora, however, can leverage the advantages of its larger size by referring patients to other in-system hospitals for care if they need it, Trotter said."

---

[15] Jay Greene, *Why Advocate Aurora Wants a Beaumont Doctor*, Crain's Detroit Bus. (Sept. 5, 2020), https://www.modernhealthcare.com/providers/why-advocate-aurora-wants-beaumont-doctor-5000-them-and-wants-them-be-happy.

[16] Bruce Murphy, *Aurora Health Care Merger is Bad News,* Urban Milwaukee (Mar. 10, 2020), https://urbanmilwaukee.com/2020/03/10/murphys-law-aurora-health-care-merger-is-bad-news/

156.    This increased leverage is especially true when AAH acquires another "must have" hospital facility. For example, in mid-2019, AAH purchased the only hospital in Marinette, Wisconsin which is now renamed Aurora Medical Center Bay Area. This facility is a must-have hospital for nearby commercial health plans in both Wisconsin and Michigan.

157.    AAH has also worked to acquire outpatient facilities and other non-hospital assets that increase its market power. According to Fitch, a leading bonds rating agency, AAH now has one of largest integrations of physicians of any firm in the hospital industry. Or, as a Wisconsin newspaper columnist wrote, "Aurora Health Care has set the standard by buying up physician practices and clinics and forcing doctors to send patients to Aurora's hospitals."[17]

158.    This strategy of non-hospital acquisitions adds to AAH's overall market power and is part of its attempt to suppress competition for outpatient medical services in Eastern Wisconsin and to ensure that members of commercial health plans are more likely to be directed to their high-cost inpatient facilities. AAH executives appear to have hinted at this strategy publicly, with the CEO of AAH saying in a 2020 article that growing AAH's number of affiliated or employed physicians is "our secret sauce," with the article noting that the desired outcome for AAH was to get paid more.[18] In 2021, the President of AAH's buyout fund was remarkably candid about AAH's goals: "One way we measure that is what we call 'share of wallet,' which is a sort of a retail measure of how many times and in what ways are we interacting with the people we serve beyond just traditional care delivery, and does that generate more revenue?"

159.    In 2008, AAH acquired Comprehensive Cardiovascular Care Group, which was described as "the largest cardiology group in Wisconsin." That acquisition resulted in the U.S.

---

[17] Mark Belling, *'Nonprofit' hospital companies chase profits; Low-income patients orphaned as hospitals build suburban palaces*, Oconomowoc Enterprise (April 12, 2018.)

[18] Greene, *supra* note 15.

50

Case 2:24-cv-00157-LA   Filed 02/05/24   Page 53 of 85   Document 1

Department of Justice alleging in 2018 that some of the acquired physicians' "compensation arrangements were not commercially reasonable . . . exceeded the fair market value of the physicians' services, took into account the physicians' anticipated referrals, and was not for identifiable services." AAH subsequently settled the case for $12 million for the alleged overcharges to government health programs resulting from its payments to physicians for referrals.[19] On information and belief, the same practice of compensating cardiologists and other specialists in order to obtain more internal AAH referrals also has improperly increased prices for commercial health plans and their members. This occurs because AAH's above-market payments to acquired physicians result in them directing members of commercial health plans to higher-cost care at AAH facilities instead of the best value care.

160.    In 2007, AAH announced a "broad affiliation agreement" with Advanced Healthcare, a group of "250 primary care physicians and specialists providing care at 14 clinics located in Milwaukee, Ozaukee, Washington and Waukesha counties." On information and belief, part of the reason for this affiliation was to eventually allow AAH to use its market power to substantially raise prices paid by commercial health plans and their members for services at these locations. Shortly after the acquisition, local reporting indicated that AAH would impose its "all-or-nothing" contracting on insurance companies, forcing them to include the facilities built to house the newly acquired physicians from Advanced Healthcare in their networks if they needed access to any part of the AAH system.

161.    After the Advanced Healthcare acquisition, AAH announced plans to build a new hospital in Grafton, Wisconsin that, among other things, would allegedly house some of the newly

---

[19] Press Release, U.S. Dep't of Just., *Aurora Health Care, Inc. Agrees to Pay $12 Million to Settle Allegations Under the False Claims Act and the Stark Law* (Dec. 11, 2018), https://www.justice.gov/usao-edwi/pr/aurora-health-care-inc-agrees-pay-12-million-settle-allegations-under-false-claims-act.

51

acquired AAH physicians. Executives from a different hospital system claimed that their analysis of health care data showed that a new hospital was not necessary in the area based on population. AAH built a new 107-bed facility anyway. In the following years, the next closest non-AAH hospital immediately lost a significant portion of its patients, forcing layoffs and restructuring. This reduction in competition is directly linked to AAH's other anticompetitive conduct: Because of its all-or-nothing, all-plans, anti-steering, anti-tiering, and gag clause provisions, the competitor hospital would have been unable to effectively compete for business from commercial health plans on price and quality. Thus, AAH was able to build a new hospital where adequate demand allegedly did not exist and gain significant market share by leveraging its broader system power and imposing anticompetitive provisions on insurance companies. Because of these actions, AAH has gone from being a non-meaningful inpatient provider in Grafton, Wisconsin to controlling nearly 76% of inpatient admissions in the larger *Port Washington HSA*.

162. This reflects a broader trend of AAH entering markets that do not have adequate demand with the goal of suppressing competition. As the Senior Associate Dean for Clinical Affairs for the Medical College of Wisconsin stated of AAH's business practices generally: "They say they're bringing in choice. . . . There's a concern they're bringing in duplication of services. I think it's the latter. They have a track record of that. . . . Is this adding choice or unnecessary redundancies, which will raise the cost of care?" This type of expansion into areas that do not have adequate demand can only be successful in the presence of anticompetitive practices imposed on insurance companies, commercial health plans, and independent providers.

163. For example, in 2010, AAH opened the Aurora Summit Medical Center in Oconomowoc less than four miles from the existing Oconomowoc Memorial Hospital. At the time, Oconomowoc Memorial Hospital was nowhere near capacity and local reporting indicated there was not adequate demand for a second hospital nearby. Nevertheless, AAH opened the facility and

52

tolerated less than 35% inpatient occupancy. Local reporting indicated that the occupancy percentage would have been even lower had AAH not acquired a number of independent physicians. On information and belief, AAH imposed the same types of non-competes and referral restrictions on those doctors as is its normal business practice in order to reduce business to Oconomowoc Memorial Hospital.

164. The outcome is that AAH has secured 38% of the inpatient market share in the Oconomowoc HSA, up from virtually none ten years ago. That market share has continued to increase in the last several years from 31% in 2016.

165. AAH's growing market power is also reflected in its ability to control prices: According to data released in May 2022, AAH's inpatient prices at Aurora Summit Medical Center are 446% of Medicare compared to only 297% of Medicare less than four miles away at Oconomowoc Memorial Hospital.[20] This is despite Oconomowoc Memorial Hospital having higher quality ratings than Aurora Summit Medical Center from the US Government's Centers for Medicare and Medicaid Services.

166. Despite having lower prices and higher quality than Aurora Summit Medical Center, Oconomowoc Memorial Hospital's inpatient visits have declined almost every year AAH has operated Aurora Summit Medical Center. Oconomowoc Memorial Hospital's inpatient visits have declined from 4,563 in 2009 (the year before AAH opened Aurora Summit Medical Center) to 3,141 in 2010 and now steadily down to 2,948 in 2021, despite the overall number of inpatient visits in the *Oconomowoc HSA* increasing substantially over that time period.

167. Oconomowoc Memorial Hospital has a very slim profit margin per inpatient visit.

---

[20] Whaley, et al., *supra* note 2.

While Aurora Summit Medical Center makes $4,341 average profit per inpatient visit and the Wisconsin state average is $3,048 profit per inpatient visit, Oconomowoc Memorial Hospital now makes only $1,168 per inpatient visit. Overall, Oconomowoc's margin is only 4%, lower than any other ProHealth or AAH hospital in Wisconsin and lower than AAH's 23% profit margin at Aurora Summit Medical Center. These very thin margins—that have fallen into a loss as recently as 2017—create a dangerous probability that Oconomowoc Memorial Hospital will be forced to reduce or close inpatient services that account for about 40% of the Oconomowoc HSA, with the resulting benefit to AAH. If Oconomowoc Memorial Hospital closes or downsizes, this will harm commercial health plans and their members because AAH will be able to raise its prices further while reducing quality.

168.    AAH's attempted monopolization of the Oconomowoc HSA inpatient market has been facilitated by anticompetitive behavior. The dramatic price difference for inpatient care between AAH's Aurora Summit Medical Center and Oconomowoc Memorial Hospital would not be possible absent AAH's use of all-or-nothing, all-plans, anti-steering, anti-tiering, and gag clauses. If insurance companies (like Cigna, Aetna, Anthem, Trilogy, Quartz, Humana, and others), and commercial health plans were free to direct their members towards lower cost care, Oconomowoc Medical Center would see a substantially higher inpatient market share and inpatient occupancy than Aurora Summit Medical Center. As described earlier, AAH's non-competes and referral restrictions limit both staffing availability and patient flow for competitors like Oconomowoc Medical Center. And, as documented earlier, AAH has taken action to undermine nearby innovative health plans that would foster price competition, including its effort to suppress reference-based pricing plans.

169.    On information and belief, AAH has pursued a similar strategy of attempted monopolization of inpatient care in other HSAs in Wisconsin using the same types of tactics.

170.     Similarly, AAH acquired a large outpatient practice called Family Health Plan, which the Milwaukee Business Journal characterized as, "a transaction that would further add to Aurora's dominance of the southeastern Wisconsin market." During the acquisition, AAH insisted that, as part of the acquisition, it be able to impose a provision that would require the acquired Family Health Plan providers to "exclusively" refer to AAH facilities. This provision was projected to be "crippling" for other health care providers in the area. On information and belief, it was only possible for AAH to insist on the exclusive referral provision because it knew that insurance companies and commercial health plans (who, along with their members, would be forced to pay higher costs as their members are exclusively referred to higher cost AAH facilities) could not challenge the clearly anti-competitive provision because of AAH's market power, and because AAH knew that the resulting higher costs would be passed onto health plan members (which they then were).

171.     The acquisition worked as AAH appears to have intended: The hospital that press reports predicted "stands to lose the most if Aurora buys Family Health Plan's medical group and clinics" ended up quickly facing "the biggest decline in net income by percentage of any Milwaukee-area hospital" after the AAH transaction. And, about six years later, a competitor hospital was forced to close since it "doesn't have the ability to fund indefinitely the types of losses we've incurred," according to the competitor's CEO. On information and belief, this closure significantly increased costs for commercial health plans and their members over the following years by eliminating an AAH facility that was a lower cost option for healthcare.

172.     In late 2010, the Milwaukee Journal Sentinel reported that AAH's other recent acquisitions have included "a large radiology practice, and the practices of the heart surgeons and related specialists who practice at Aurora St. Luke's Medical Center." On information and belief, these acquisitions were partly driven by the ability of AAH to impose higher prices for the exact

55

same imaging services on commercial health plans and their members after the radiology acquisition and to control referrals to and from these facilities.

173.    In 2013, AAH acquired The Manitowoc Surgery Center which reduced competition for outpatient services in the region. AAH described the goal of the acquisition as increasing "outpatient surgery services within Aurora's integrated health care system." On information and belief, the acquisition was partly driven by the ability of AAH to impose higher prices for the exact same surgery services, by the desire to reduce competition from outpatient surgery centers that academic literature has indicated provide effective and lower-cost competition to hospitals, and by the desire to use referral restrictions to direct more patients in the *Manitowoc HSA* to AAH inpatient facilities, where AAH now controls over 47% of inpatient admissions.

174.    In 2016, the Wisconsin Heart Hospital in Wauwatosa closed. This closure took place after independent providers reported they were "punished" by AAH for investing in or being affiliated with the Wisconsin Heart Hospital, including a well-documented decision by AAH to remove a respected physician from the role of medical director at AAH's Aurora West Allis Hospital because of her affiliation with the Wisconsin Heart Hospital. Physicians and medical associations also expressed concern that AAH was using coercive referral practices to force specialist physicians to refer to AAH instead of competitors, including Wisconsin Heart Hospital. On information and belief, AAH's actions contributed to the closure of Wisconsin Heart Hospital, eliminating a potential competitor that could have contained costs, particularly in the *Milwaukee and West Allis HSAs*.

175.    After AAH acquired a home care company for seniors in 2021, the CEO of AAH's internal buyout fund stated that, "This opens a lot of opportunities for us, thinking about what we can be in the broader healthcare continuum. How do you control the overall continuum? How do you own it? It's very hard for one person, one company or one organization to have all of the parts.

56

Well, I think we're the first organization in the country that now can say *we own the full healthcare continuum*."[21]

176. In its largest financial transaction in the past decade, AAH was created by the merger of Aurora Health Care in Wisconsin and Advocate Health Care in Illinois. This merger made AAH one of the largest hospital systems in the country. The transaction both increased AAH's combined market power in Southeastern Wisconsin and Northeastern Illinois[22] and increased AAH's overall leverage over insurance companies, especially those with networks designed for commercial health plans with members in both Illinois and Wisconsin. AAH is thus in an even stronger position to impose anticompetitive terms on insurance companies and to extract supracompetitive prices from commercial health plans and their members.

177. Even before the merger, AAH was acquiring physician groups in Northern Illinois.

178. The CEO of a Wisconsin company with a self-funded health plan remarked that the merger would raise prices for Wisconsin self-funded health plans and their members like his, writing:

> For the life of me, I [can't] see how the proposed mega-merger between Aurora Health Care of Wisconsin and Advocate Health Care Network of Illinois will benefit payers like my company Serigraph or its co-workers. The main rationale for the executives and boards of the two non-profit corporations must be that bigger is better in a rapidly changing and consolidating industry. They must believe they will have more clout when dealing with the major health insurance carriers. But more clout on the

---

[21] Robert Holly, *"We Own the Full Health Care Continuum": Advocate Aurora Enterprises Acquires Senior Helpers*, Home Health Care News (Apr. 1, 2021) (emphasis added), https://homehealthcarenews.com/2021/04/we-own-the-full-health-care-continuum-advocate-aurora-enterprises-acquires-senior-helpers.

[22] For example, Aurora controlled about 32% of inpatient admissions in the border community of Winthrop Harbor, Illinois before the merger to about 41% of inpatient admissions after the merger. Commercial health plans based in Illinois paid AAH for services in Wisconsin before the merger and paid AAH for services in Wisconsin and Illinois after the merger.

provider side means higher prices, not lower. Do corporations seek more leverage so they can lower prices? Don't be naïve.[23]

179.     After the merger, inpatient prices increased at AAH facilities in Wisconsin. This is reflected in the median net profit margin AAH earned from patients increasing over 20% for its facilities in Wisconsin from 2017 to 2019. This merger and resulting market power growth has already resulted in higher prices for Wisconsin commercial health plans and their members and will continue to as AAH's misuse of its ever-growing market power continues.

180.     Similarly, inpatient prices increased at AAH's facilities in Illinois with the median net profit margin AAH earned from patients increasing from 7.1% in 2017 (the last full year before the merger) to 7.8% (the first full year after the merger). As alleged above, there is significant evidence that AAH uses its market power to impose supracompetitive prices and anticompetitive contract terms at newly acquired facilities. A nearly 10% growth in inpatient net profit margins for AAH Illinois facilities immediately after a merger fits that well-documented pattern for AAH.

181.     And the academic literature supports the fact that prices have increased at AAH's newly integrated Illinois and Wisconsin facilities because of market power. As the Kaiser Family Foundation wrote, "One reason that prices rise when there are hospital mergers across markets is that they increase hospital bargaining positions with insurers, which seek to have strong provider networks across multiple areas in order to attract employers with employees in multiple locations."

182.     AAH has not stopped there. It has since merged with Atrium Health of North Carolina, a combination that created a conglomerate that does business in seven states. This merger has further increased AAH's market power with insurance companies, especially the insurance companies who operate in both the existing AAH and Atrium markets, according to healthcare

---

[23] John Torinus, *Will Aurora Merger Pay Off for Customers?*, John Torinus: Blog, https://johntorinus.com/general-blog/health-care-economics/will-aurora-merger-pay-off-customers (last visited Jan. 31, 2024).

economists. Separately, Professor Barak Richman of Duke University said that the merger was "very, very alarming" and would likely lead to higher prices. "This does not point to a new frontier of competition.  It points to a new scale of lack of competition. A new scale of monopoly power," Richman said.

183.    And AAH's abuse of its monopoly power directly harms members of commercial health plans, like Plaintiffs. As explained above, due to AAH's all-or-nothing negotiating and anticompetitive contractual provisions, commercial insurance plans have no choice but to accept these new facility fees. Commercial health plans then pass these overcharges onto their members, both individuals and employers, in the form of higher insurance premiums. Members also pay higher prices directly in the form of higher co-pays, co-insurance, and other out-of-pocket expenses.

## VIII.   AAH'S ANTICOMPETITIVE CONDUCT CAUSES ARTIFICIALLY INFLATED PRICES AND SUPPRESSES QUALITY.

### A.    AAH's Prices Drive Costs for Commercial Health Plans and Their Members.

184.    Prices set by hospital systems like AAH are the primary driver of cost for commercial health plans and their members. And, as explained previously, AAH's anticompetitive conduct allows it to set supracompetitive prices that commercial health plans and their members must pay.  Commercial health plans and their members have made billions of dollars in payments to AAH at the supracompetitive price levels AAH's unlawful conduct has enabled it to charge.

185.    A Harvard University analysis concluded that, "Variation in spending in the commercial insurance market is due mainly to differences in price markups by providers rather than to differences in the utilization of healthcare services. . . . 70 percent of variation in total commercial spending is attributable to price markups, most likely reflecting the varying market power of providers."

59

186.    In fact, a *Milwaukee Journal Sentinel* report on AAH's acquisition and negotiation strategy noted that, contrary to Aurora's claims of improved efficiency, studies have found that consolidation gives hospital systems more leverage in negotiating higher prices.

187.    As explained below, in Milwaukee specifically healthcare prices are inexplicably high considering the ostensible level of competition in the market. The unjustifiably high prices paid by Eastern Wisconsin commercial health plans and their members are made possible by AAH's anticompetitive behavior and are evidence of AAH's market power and ability to control prices in both the inpatient and outpatient markets.

188.    These data make clear that AAH's anticompetitive conduct facilitates the supracompetitive prices it charges to commercial health plans and their members in all the HSAs where AAH operates. Under federal and state antitrust and unfair trade practices precedents, when vertical restraints like those AAH has forced on insurance companies lead to higher prices and lower quality, that is direct evidence that they are anticompetitive.

**B.      AAH Charges Supracompetitive Prices in Milwaukee.**

189.    Milwaukee employers and residents pay extraordinarily high prices for healthcare. Overall, Milwaukee has the fourth highest prices for healthcare in the entire country with overall prices 44% above the national median. Indeed, Milwaukee's healthcare prices are higher than those in New York City. Overall healthcare spending per person in the Milwaukee metro area is 21% above the national median, making it the seventh highest metro area in the country for per person healthcare spending.

190.    Moreover, Milwaukee's already high prices are continuing to rise: From 2015 to 2019, hospital prices rose in Milwaukee at the fifth highest rate of any market in the entire country.

191.    These high prices are despite the existence—on paper—of a healthy level of competition in Milwaukee. This competition should control prices. But the vertical restraints

described above that AAH has used to undermine competition have been key drivers of Milwaukee's extraordinarily high healthcare costs.

192.    AAH is by far the most expensive hospital system in Milwaukee, charging supracompetitive prices for inpatient and outpatient procedures and significantly driving up the cost of healthcare for commercial health plans and their members that have paid AAH's supracompetitive prices in Milwaukee and nearby HSAs.

193.    A comparison of inpatient prices shows that AAH's prices are 65% more expensive than an average of the other large hospitals in the Milwaukee area. This dramatic price differential within a market is one of the highest in the country.

194.    Overall, AAH's prices at its flagship facility in Milwaukee are 373% of the Medicare rates, compared to a state average of 307%, according to data published in May 2022. This is despite the fact that AAH itself makes a profit on Medicare rates as detailed in a comprehensive independent recent report evaluating hospital profitability.

195.    For example, prices for common procedures at Aurora St. Luke's Medical Center are dramatically higher than they are at Ascension St. Francis Hospital, a facility only 5 minutes away with similar quality ratings.

196.    Similarly, prices are higher at AAH's St. Luke's facility than they are at Froedtert Hospital, a different competitor less than 20 minutes away that is generally rated as providing higher quality by patients and safer by independent ratings agencies. *US News and World Report* ranks Froedtert Hospital as the number one hospital in Milwaukee, and a higher percentage of patients would recommend Froedtert Hospital than would recommend AAH's St. Luke's according to Healthgrades.

197. When evaluating prices for specific procedures, academic literature suggests one useful analysis is comparing "narrowly defined" procedures, *i.e.*, those that have little variation within the procedure and occur with sufficient frequency to support empirical analysis.

198. One example of a "narrowly defined" procedure that is also a very high revenue procedure for hospitals is a joint replacement. For a major commercial network, AAH's price for a hip or knee replacement in Milwaukee is $62,538, over $21,000 higher than the price for the same procedure five minutes away at a competitor hospital. Charging customers approximately 50% more than a nearby competitor for a common procedure would not be possible in a functioning, competitive market. This price differential cannot be explained by AAH's market power in Milwaukee, where it only controls about 40% of the market for acute inpatient hospital services. Thus, this price differential is the result of the anticompetitive contracting restrictions AAH imposes on insurance companies and commercial health plans in Milwaukee, by virtue of its dominant power both systemwide and over the AAH Monopolized Inpatient Markets.



199. For other very common surgeries, including appendectomies and angioplasties, AAH charges supracompetitive prices. For both procedures, AAH's price is almost double that of

Ascension, the other main competitor in Milwaukee. For appendectomies, AAH's price is $46,002 compared to $24,172 at Ascension. For angioplasties, AAH's price is $79,880 compared to $43,319 at Ascension.



200. For inpatient treatment of other common diseases like sepsis, pneumonia, esophagitis, and heart failure, AAH is also significantly more expensive than other hospitals in Milwaukee. AAH is 54-105% more expensive than Ascension for those procedures and 15-53% more expensive than Froedtert for those procedures.



201.    Additionally, prices for outpatient procedures are significantly higher at AAH's flagship facility in Milwaukee than competitors. This includes substantially higher prices than independent outpatient providers and extends even to its large hospital peers, where AAH's prices for outpatient services average over 22% higher than other large hospitals. These outpatient prices in Milwaukee relative to other providers can only be explained by AAH's abuse of its systemwide market power in its monopoly power in other markets to control outpatient prices in Milwaukee. Without the vertical restraints that AAH uses to leverage its market power systemwide, AAH would not be able to maintain these supracompetitive outpatient prices.

202.    For example, AAH's price for a colonoscopy with biopsy—an extremely common and uncomplicated procedure—is over $10,700 for a common commercial health plan and its members whereas the procedure costs only about $4,700 at Froedtert & the Medical College of Wisconsin for the same plan, a facility that is about 15 minutes away and has generally higher quality and safety ratings. Prices for a routine procedure that are more than double a nearby competitor cannot be explained absent AAH's restraints on competition.

64



203.     A CT scan of the head or brain is one of the procedures that drives a large portion of hospital imaging revenue. It is also a procedure that academic literature considers "plausibly undifferentiated" because "there is little variation in how these services are delivered across hospitals or across patients within a hospital." Thus, academic literature considers "plausibly undifferentiated" procedures like CT scans a useful way to compare hospital prices, because any price differential is likely explained by market power and/or anticompetitive restraints rather than quality. While there is no differentiation as to the quality of a CT scan performed at AAH versus a competitor, AAH does find a way to differentiate as to price: Its price is over $300 more than nearby Froedtert & the Medical College of Wisconsin.



65

204.    Another important way to compare prices is by looking at low-cost but extremely high-volume procedures like routine blood tests. On this count, AAH's prices are egregious, with a commercial health plan and its members paying *more than double* the price at AAH compared to the nearby Froedtert & the Medical College of Wisconsin. Because these tests are conducted hundreds of times a day at AAH, the impact of such dramatically supracompetitive prices on commercial health plans and their members is substantial.



205.    Since 2015, healthcare prices in Milwaukee have risen at the fifth highest rate in the entire country. AAH's high and rising prices driven by anticompetitive behavior are a major contributor to this increasing financial burden on Milwaukee employers and families.

**C.    AAH Charges Supracompetitive Prices in Green Bay.**

206.    AAH also charges supracompetitive prices for inpatient and outpatient procedures in Green Bay despite facing some ostensible competition from three other non-AAH hospitals. As a result, Green Bay is one of the top five metro areas in the entire country for the price of medical professional services relative to Medicare.

207.    As to inpatient care, AAH's Aurora Baycare Medical Center has dramatically higher prices than nearby facilities according to data published in May 2022. Its average inpatient

66

prices are almost 328% of the Medicare rates while the other three hospitals in Green Bay are only 223%, 256%, and 299%.

208.     As to outpatient care, AAH's average prices across all outpatient procedures are even more inflated, registering at 350% of Medicare. All three other hospitals have lower prices than AAH, with an average markup over Medicare of 311%. These outpatient prices relative to other providers can only be explained by AAH's abuse of its market power in other parts of Wisconsin to control prices in Green Bay and by AAH's contracting practices.

209.     These high prices are despite AAH's Baycare Medical Center having lower quality ratings from the federal government's Centers for Medicare & Medicaid Services and lower safety ratings from the independent ratings agency Leapfrog than the next two nearest competitor hospitals.

### D.     AAH Charges Supracompetitive Prices Throughout Wisconsin.

210.     AAH's supracompetitive prices facilitated by anticompetitive conduct extend to every area where AAH operates.

211.     For example, in Oshkosh AAH's price for an angioplasty is about double that of the two nearest hospitals, one of which is less than 2 miles away. Similarly, AAH's price for joint replacement is 60% higher than the two nearest inpatient competitors.

212.     In Kenosha, AAH's price for a joint replacement is over $15,000 higher than a Froedtert facility that is less than 7 miles away. Similarly, the price for an angioplasty is nearly $7,000 higher.  Overall, the weighted average price (which accounts for differences in acuity) for an inpatient service is $42,167 for AAH's Kenosha facility versus $32,099 at the nearby Froedtert facility.

213.    In Sheboygan, AAH's prices for outpatient procedures are extremely inflated: AAH's prices are 358% of Medicare compared to the nearest competitor with prices of 308% of Medicare.

214.    In Oconomowoc where AAH opened Aurora Summit Medical Center four miles away from the existing Oconomowoc Memorial Hospital, AAH's prices for inpatient services average 446% of Medicare compared to only 297% of Medicare at Oconomowoc Memorial Hospital. Overall, the weighted average price (which accounts for differences in acuity) for an inpatient service is $44,411 for AAH's Oconomowoc facility versus $23,104 at the nearby Oconomowoc Memorial Hospital, a remarkable 92% higher.

215.    In Marinette, AAH's inpatient and outpatient prices are substantially above the state average and substantially higher than the next nearest non-AAH hospital.

216.    As reflected in specific procedures outlined above and in an analysis of aggregate data, AAH's prices for outpatient procedures overall are substantially more expensive than the Wisconsin and national averages.

217.    A major Wisconsin insurer and Network Vendor stated in 2006 that "Aurora is a high-price healthcare provider relative to other providers." Since then, AAH's prices have increased substantially, both as an absolute matter and as compared to its competitors.

### E.    AAH Raised Prices In Illinois Substantially After the Merger.

218.    After the merger of Advocate and Aurora to form AAH, the combined system substantially raised prices in Illinois. This occurred both in the areas previously serviced primarily by Advocate as well as in the areas near the Wisconsin border where Aurora had previously operated.

219.    Two sets of data from the highly respected, independent RAND Corporation indicate the substantial price increases AAH imposed as a result of the merger: During the period

of 2016-2018 (almost entirely before the merger was finalized in April 2018), what were then the Advocate hospitals in Illinois had average commercial prices (both inpatient and outpatient) of 231% of Medicare. During the period of 2018-2020 (primarily after the merger), the same hospitals in Illinois, now owned by AAH, had average commercial prices of 253% of Medicare. This substantial increase in prices was on an absolute level, relative to competitors, and compared to the well-accepted baseline of Medicare.

220.    The combined power of the two systems gave the merged entity even more ability to continue Aurora's longstanding practice of imposing the anticompetitive contracting restraints and referral restrictions described above that increase prices for commercial health plans and their members in Illinois, Michigan, and Wisconsin.

## IX.    CLASS ALLEGATIONS

### A.    Class Definition

221.    Plaintiffs define the putative class in this litigation as follows:

Citizens of Illinois, Michigan, and/or Wisconsin for purposes of 28 U.S.C. §1332 who were members of commercial health plans that, during the past six years (the "Class Period"), compensated AAH for general acute care hospital services or ancillary products at an AAH facility in the Relevant Geographic Markets during any period that AAH employed All-or- Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Gag Clauses, and/or other vertical restraints in one or more agreements or negotiations with insurance companies.

222.    The Class is ascertainable because it is defined to include only members of commercial health plans that are entities within the Relevant Geographic Markets that caused at least one individual claim for acute hospital services or ancillary products to be paid to AAH during the Class Period.

223.    Excluded from the Class are AAH and its officers, directors, management, employees, subsidiaries, or affiliates, the Presiding Judge, employees of this Court, and any

appellate judges exercising jurisdiction over these claims as well as employees of that appellate court(s).

**B.      Certification Requirements**

224.    Plaintiffs do not yet know the exact size of the Class; however, based upon the nature of the industry involved, Plaintiffs believe that there are at least tens of thousands of Class members. Therefore, Class members are so numerous and geographically dispersed that joinder is ultimately impracticable.

225.    Because AAH has acted in a generally consistent manner applicable to the Class writ large, questions of law and fact common to the Class exist as to all members of the class and predominate over any questions affecting only individual members of the class. The common questions include, but are not limited to:

**a.**      Whether Defendants have a monopoly in the *AAH Monopolized Inpatient Markets*;

**b.**      Whether Defendants have acted willfully or otherwise unlawfully in attempting to acquire, maintain, or abuse its monopoly;

**c.**      Whether AAH implemented contract provisions that unreasonably restrain trade by imposing All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Gag Clauses, and/or other conduct that foreclosed competition in the relevant markets;

**d.**      Whether AAH's vertical restraints enable it to charge unlawful supracompetitive prices;

**e.**      Whether AAH's ongoing conduct continues to restrain trade and reinforce its market power;

**f.**      Whether AAH's anticompetitive conduct results in the foreclosure and/or substantial lessening of competition;

**g.**      Whether AAH's conduct violates 15 U.S.C. §§ 1-2 ("the Sherman Act"); and

**h.** Whether AAH's conduct violates Wis. Stat. § 133.01, *et seq*.

226. Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and the other Class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

227. Plaintiffs will adequately represent the interest of all Class members. Plaintiffs have retained class counsel who are experienced and qualified in prosecuting such class action cases. Neither Plaintiffs nor class counsel have any interests in conflict with those of the Class members.

228. This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affect only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of all members of the class is impracticable and class treatment will permit a large number of similarly situated members of commercial health plans to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

229. Furthermore, the prosecution of the claims of the Class in part for injunctive relief is appropriate because AAH has acted, or refused to act, on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

X. **CLAIMS FOR RELIEF**

**COUNT ONE**
**RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 1)**

230. The above-alleged paragraphs are incorporated by reference.

231. Defendant AAH entered into and continues to enter into anticompetitive contracts with insurance companies and is engaging in unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

232. AAH hospitals located in the AAH-dominated markets have overwhelming market power in each of their *AAH Monopolized Inpatient Markets*. Moreover, AAH writ large has systemwide power that gives it market power over its entire service area. That market power has enabled AAH to impose anticompetitive vertical restraints such as all-or-nothing, all-plans, anti-steering, anti-tiering, non-competes, and gag clauses in written agreements and/or in contract negotiations with insurance companies.

233. AAH has imposed these vertical restraints in its negotiations with all or nearly all insurance companies it negotiates with in Wisconsin, as well as all or nearly all commercial health plans that use networks that contain AAH facilities.

234. By compelling insurance companies to agree to these anticompetitive terms, AAH unlawfully restrains trade and the limits the ability of competitors to compete in the Relevant Geographic Markets for general acute care hospital services and ancillary products. The anticompetitive effects of AAH's conduct far outweigh any purported non-pretextual, pro-competitive justifications.

235. These vertical restraints, together and individually, have foreclosed a substantial amount of competition. Because AAH imposes them on all or nearly all insurance companies and commercial health plans, these anticompetitive contracting terms have affected competition as a whole in the relevant markets.

72

236.     As a proximate result of AAH's unlawful conduct, Plaintiffs and members of the Class have paid supracompetitive prices to AAH in the form of out-of-pocket expenses, prices that are higher than they would have been absent AAH's anticompetitive conduct. Plaintiffs and members of the Class have also had to pay higher premiums to their health plans as a result of AAH's anticompetitive conduct.

237.     Thus, Plaintiffs and members of the Class have been injured in violation of the Sherman Act, having been subjected to and paying supracompetitive pricing to AAH for acute general care hospital services and ancillary products during the Class Period and paying higher premiums to their health plans as a result of AAH's anticompetitive conduct. Such damages are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of Defendant's unlawful conduct. Under 15 U.S.C. § 1 and 15 U.S.C. § 15, Plaintiffs and the members of the Class have standing to and do hereby seek injunctive relief, together with other declaratory and equitable relief, as well as attorneys' fees and costs, but do not seek damages for this claim.

**COUNT TWO**
**MONOPOLIZATION IN VIOLATION OF**
**THE SHERMAN ACT**
**(15 U.S.C. § 2)**

238.     The above-alleged paragraphs are incorporated by reference.

239.     Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." It is also unlawful to willfully maintain or abuse monopoly power.

240.     Defendants have monopolized, and continue to monopolize, the *AAH Monopolized Inpatient Markets* alleged herein in violation of 15 U.S.C. § 2. During the pertinent times, Defendants engaged in the willful and unlawful attempt to maintain and abuse their monopoly

73

power. They did so by using their market power in those geographies to impose on insurance companies and commercial health plans anticompetitive vertical restraints, including All-or-Nothing, All- Plans, Anti-Steering, Anti-Tiering, Non-Competes, Referral Restrictions, and/or Gag Clauses.

241.    These vertical restraints have had the direct effect of inhibiting competition from existing and/or would-be competitors that would compete with AAH on price and quality.

242.    These restraints have also allowed AAH to leverage its monopoly power over the *AAH Monopolized Inpatient Markets* to extract supracompetitive prices in the other geographies in which it operates.

243.    Plaintiffs and members of the Class have been harmed by AAH's abuse, willful maintenance, and leveraging of its monopoly power. They have paid higher prices at AAH facilities in the Relevant Geographic Markets than they would have absent AAH's unlawful monopolization, both directly due to the vertical restraints themselves and due to the substantial lessening of competition the restraints have facilitated. Plaintiffs and members of the Class have also had to pay higher premiums to their health plans as a result of AAH's anticompetitive conduct.

244.    Thus, Plaintiffs and members of the Class have been injured in violation of the Sherman Act, having been subjected to and paying supracompetitive pricing to AAH for acute general care hospital services and ancillary products during the Class Period and paying higher premiums to their health plans as a result of AAH's anticompetitive conduct. Such damages are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of Defendant's unlawful conduct.  Under 15 U.S.C. § 2 and 15 U.S.C. § 15, Plaintiffs and the members of the Class have standing to and do hereby seek injunctive relief, together with other declaratory and equitable relief, as well as attorneys' fees and costs, but do not seek damages for this claim.

## COUNT THREE
## ATTEMPTED MONOPOLIZATION IN VIOLATION OF
## THE SHERMAN ACT
## (15 U.S.C. § 2)

245.    The above-alleged paragraphs are incorporated by reference.

246.    Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

247.    During the pertinent times, AAH engaged in the willful and unlawful attempt to maintain or expand its monopoly power. Specifically, AAH attempted to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA.

248.    During the pertinent times, AAH attempted to acquire or expand its monopoly through illegitimate means, including but not limited to through tying and unlawful restraints such as All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Referral Restrictions, and/or Gag Clauses.

249.    One motivation AAH had in imposing these restraints was its intent to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA.

250.    There is a dangerous probability that AAH will be successful in its attempt to monopolize that market.

251.    Plaintiffs and members of the Class have been injured by AAH's use of these vertical restraints and would be further injured if AAH is successful in monopolizing the Oconomowoc HSA.

252.    Under 15 U.S.C. § 2 and 15 U.S.C. § 15, Plaintiffs and the members of the Class have standing to and do hereby seek injunctive relief, together with other declaratory and equitable relief, as well as attorneys' fees and costs, but do not seek damages for this claim.

75

## COUNT FOUR
## RESTRAINT OF TRADE IN VIOLATION OF WISCONSIN ANTITRUST LAW
### (Wis. Stat. § 133.03(1))

253.    The above-alleged paragraphs are incorporated by reference.

254.    Defendant AAH entered into and continues to enter into anticompetitive contracts with insurance companies and is engaging in a conspiracy in unreasonable restraint of trade in violation of the Wis. Stat. § 133.03(1).

255.    AAH hospitals located in the AAH-dominated markets have overwhelming market power in each of their *AAH Monopolized Inpatient Markets*. Moreover, AAH writ large has systemwide power that gives it market power over its entire service area. That market power has enabled AAH to impose anticompetitive vertical restraints such as All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, and Gag Clauses in written agreements and/or in contract negotiations with insurance companies.

256.    AAH has imposed these vertical restraints in its negotiations with all or nearly all insurance companies it negotiates with in Wisconsin, as well as all or nearly all commercial health plans that use networks that contain AAH facilities.

257.    By compelling insurance companies to agree to these anticompetitive terms, AAH unlawfully restrains trade and the limits the ability of competitors to compete in the Relevant Geographic Markets for general acute care hospital services and ancillary products. The anticompetitive effects of AAH's conduct far outweigh any purported non-pretextual, pro-competitive justifications.

258.    These vertical restraints, together and individually, have foreclosed a substantial amount of competition. Because AAH imposes them on all or nearly all insurance companies and commercial health plans, these anticompetitive contracting terms have affected competition as a whole in the relevant markets.

76

259.     As a proximate result of AAH's unlawful conduct, Plaintiffs and members of the Class have been injured in violation of Wis. Stat. § 133.03(1), having been subjected to and paying supracompetitive pricing for acute general care hospital services and ancillary products during the Class Period and paying higher premiums to their health plans as a result of AAH's anticompetitive conduct.  Such damages are the type of injury that the antitrust laws were explicitly designed to prevent and they are a direct result of Defendants' unlawful conduct. Under Wis. Stat. § 133.18, Plaintiffs and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—for harm suffered during the last six years, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

<u>COUNT FIVE</u>
**MONOPOLIZATION IN VIOLATION OF WISCONSIN ANTITRUST LAW**
**(Wis. Stat. § 133.03(2))**

260.     The above-alleged paragraphs are incorporated by reference.

261.     Wis. Stat. § 133.03(2) makes it unlawful for any person to "monopolize[] . . . any part of trade or commerce." Like its federal counterpart, 15 U.S.C. § 2, Wis. Stat. § 133.03(2) also prohibits the acquisition, willful maintenance, abuse, and leveraging of monopoly power.

262.     Defendant has monopolized, and continues to monopolize, the *AAH Monopolized Inpatient Markets* alleged herein in violation of Wis. Stat. § 133.03(2). During the pertinent times, Defendant engaged in the willful and unlawful attempt to maintain and abuse its monopoly power. It did so by using its market power in those geographies to impose on insurance companies and commercial health plans anticompetitive vertical restraints, including All-or-Nothing, All- Plans, Anti-Steering, Anti-Tiering, Non-Competes, Referral Restrictions, and/or Gag Clauses.

263.     These vertical restraints have had the direct effect of inhibiting competition from existing and/or would-be competitors that would compete with AAH on price and quality.

77

264.    These restraints have also allowed AAH to leverage its monopoly power over the *AAH Monopolized Inpatient Markets* to extract supracompetitive prices in the other geographies in which it operates.

265.    Plaintiffs and members of the Class have been harmed by AAH's abuse, willful maintenance, and leveraging of its monopoly power. They have paid higher prices at AAH facilities in the Relevant Geographic Markets (in the form of out-of-pocket expenses) than they would have absent AAH's unlawful monopolization, both directly due to the vertical restraints themselves and due to the substantial lessening of competition the restraints have facilitated. Plaintiffs and members of the Class have also had to pay higher premiums to their health plans as a result of AAH's anticompetitive conduct, primarily because commercial insurance companies directly pass on higher prices charged by hospitals to individuals and employers through rising premiums, deductibles, and copays. As one Harvard University analysis concluded: "Variation in spending in the commercial insurance market is due mainly to differences in price markups by providers rather than to differences in the utilization of health care services . . . . 70 percent of variation in total commercial spending is attributable to price markups, most likely reflecting the varying market power of providers." And the federal Government's official guide for purchasing individual health insurance indicates that "differences in competition" are one of the primary drivers of variation in insurance premiums.

266.    Thus, Plaintiffs and members of the Class have been injured under Wis. Stat. § 133.03(2), having been subjected to and paying supracompetitive pricing to AAH for acute general care hospital services and ancillary products during the Class Period and paying higher premiums to their health plans as a result of AAH's anticompetitive conduct. A significant body of economic literature demonstrates that when hospital systems such as AAH charge supracompetitive prices to commercial health plans, those health plans pass all or most of those

78

overcharges to insured members (such as Plaintiffs) through higher premiums. The extent to which commercial health plans passed on these overcharges to Plaintiffs and the putative class is readily ascertainable through established methodologies that have been accepted by other courts. And because no other person could recover for these payments, there is no risk of double recovery.

267.    Furthermore, such damages are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of Defendants' unlawful conduct. Under Wis. Stat. § 133.18, Plaintiffs and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—for harm suffered during the last six years, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**COUNT SIX**
**ATTEMPTED MONOPOLIZATION IN VIOLATION OF WISCONSIN ANTITRUST LAW**
**(Wis. Stat. § 133.03(2))**

268.    The above-alleged paragraphs are incorporated by reference.

269.    Wis. Stat. § 133.03(2) makes it unlawful for any person to "attempt[] to monopolize . . . any part of trade or commerce . . . ."

270.    During the pertinent times, AAH engaged in the willful and unlawful attempt to maintain or expand its monopoly power. Specifically, AAH attempted to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA.

271.    During the pertinent times, AAH attempted to acquire or expand its monopoly through illegitimate means, including but not limited to through tying and unlawful restraints such as All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, Referral Restrictions, and/or Gag Clauses.

272.    One motivation AAH had in imposing these restraints was its intent to monopolize the market for acute inpatient hospital care in the Oconomowoc HSA.

273.   There is a dangerous probability that AAH will be successful in its attempt to monopolize that market.

274.   Plaintiffs and members of the Class have been injured by AAH's use of these vertical restraints and would be further injured if AAH is successful in monopolizing the Oconomowoc HSA.

275.   Under Wis. Stat. § 133.18, Plaintiffs and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—for harm suffered during the last six years, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## COUNT SEVEN
## INJUNCTIVE, EQUITABLE, DECLARATORY RELIEF

276.   The above-alleged paragraphs are incorporated by reference.

277.   The Court has authority to award injunctive relief pursuant to 15 U.S.C. § 26, Wis. Stat. § 133.16(a), and the Court's inherent authority.

278.   The Court has authority to award declaratory relief under 28 U.S.C. § 2201 and Wis. Stat. § 133.16(a).

279.   Plaintiffs plead that to the extent the facts and law allow for the imposition of equitable, declaratory, or injunctive remedies, they plead recourse to any and all such remedies.

280.   Plaintiffs request the Court order the reformation of AAH's practices, and/or contractual and agreement terms, including, for example express language against use of the use of All-or-Nothing, All-Plans, Anti-Steering, Anti-Tiering, Non-Competes, and Gag Clauses.

281.   Plaintiffs and the Class members have standing to and do seek equitable relief against AAH, including an injunction to prohibit AAH's illegal conduct as well as an order of equitable restitution and disgorgement of the monetary gains AAH obtained from its unfair competition to the extent such a remedy be allowed by law.

80

**XI. JURY DEMAND**

282. Plaintiffs demand a trial by jury.

**XII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf, and on behalf of those similarly situated, and adjudge and decree as follows:

A. Certify the proposed Class, designate the named Plaintiffs as class representatives and the undersigned counsel as class counsel, and allow Plaintiffs and the Class to have trial by jury;

B. Find that Defendants have unreasonably restrained trade in violation of 15 U.S.C. § 1 and Wis. Stat. § 133.03(1) and that Plaintiffs and the Class members have been damaged and injured as a result of these violations;

C. Find that Defendants have monopolized, and continue to monopolize, the relevant markets alleged herein in violation of 15 U.S.C. § 2 and Wis. Stat. § 133.03(2) and that Plaintiffs and the Class members have been damaged and injured as a result of these violations;

D. Find that Defendants engaged in a trust, contract, combination, or conspiracy in violation of 15 U.S.C. § 1 and Wis. Stat. § 133.03 and that Plaintiffs and the Class members have been damaged and injured as a result of this violation;

E. Order under Wis. Stat. § 133.18 that Plaintiffs and members of the class recover treble threefold the damages determined to have been sustained by them as a result of Defendants' misconduct complained of herein, and that judgment be entered against Defendants for the amount so determined;

F. Enter judgment against Defendants and in favor of Plaintiffs and the Class awarding restitution and disgorgement of ill-gotten gains to the extent such an equitable remedy be allowed by law;

G. Award reasonable attorneys' fees, costs, expenses, prejudgment and post-judgment interest, to the extent allowable by law;

H. Award equitable, injunctive, and declaratory relief, including but not limited to declaring Defendants' misconduct unlawful and enjoining them, their officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on their behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts competition in the manner as alleged herein above; and

I. Award such other and further relief as the Court may deem just and proper.

81

Respectfully submitted this 5th day of February, 2024.

**STAFFORD ROSENBAUM LLP**

Douglas M. Poland (SBN 1055189)
Erin K. Deeley (SBN 1084027)
David P. Hollander (SBN 1107233)
Mason A. Higgins (SBN 1124805)
222 West Washington Avenue, Suite 900
Madison, WI 53703
Tel.: (608) 256-0226
Fax: (608) 259-2600
dpoland@staffordlaw.com
edeeley@staffordlaw.com
dhollander@staffordlaw.com
mhiggins@staffordlaw.com

**HOLWELL SHUSTER & GOLDBERG LLP**

By: */s/ Gregory Dubinsky*
Vincent Levy (4712667)
Gregory J. Dubinsky (5075056)
Kevin D. Benish (5512397)
Byron J. Hazzard (5940754)
425 Lexington Avenue, 14th Floor
New York, New York 10017
Tel: (646) 837-5151
Fax: (646) 837-5150
Email: vlevy@hsgllp.com
gdubinsky@hsgllp.com
kbenish@hsgllp.com
bhazzard@hsgllp.com