# Exhibit 7

# HOLWELL SHUSTER & GOLDBERG LLP

*425 Lexington Ave., 14th Floor*
*New York, New York 10017*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Gregory J. Dubinsky*
*(646) 837-8554*
*gdubinsky@hsgllp.com*

August 8, 2025

**<u>BY EMAIL</u>**

Anne Johnson Palmer
Ropes & Gray
Three Embarcadero Center
San Francisco, CA 94111
anne.johnsonpalmer@ropesgray.com

Re: ***Uriel Pharmacy Health v. Advocate Aurora Health, Inc.***, **No. 22-cv-610 (E.D. Wis.), and**
     <u>***Patrick Shaw, et al. v. Advocate Aurora Health, Inc., et al.***</u>**, No. 24-cv-157 (E.D. Wis.)**

Counsel:

We write in response to your letter dated August 1, 2025.

We remain concerned by our late-breaking discovery of the Consumer Insights Network Drive and maintain that it warrants further inquiry into whether there are additional non-custodial data sources that are likely to contain responsive documents that you have neither disclosed nor searched. Indeed, the Consumer Insights Network Drive appears to be a non-custodial data source that should have been *initially disclosed* as "likely to contain discoverable ESI." Stipulated Order Regarding ESI Protocol and Format of Productions §III(b). It also appears exceedingly likely to contain documents responsive to requests for production that you purported to have addressed well before the *Uriel* plaintiffs issued RFP 68. *Compare* AAHEDWI02574124 at -138, -155 (relaying employers' and consumers' views on whether Aurora and its competitors constitute "must have" health systems); Paul Blomeyer Deposition Transcript at 136–58 (confirming that the survey and results cited in AAHEDWI02574124 would "be housed in" the Consumer Insights Network Drive); *id.* at 52–72 (describing a Consumer Insights survey that examined "how likely [consumers were] to recommend" Advocate Aurora as compared to "other nonacademic hospitals" and whether consumers felt that Advocate Aurora and its competitors were meeting the consumers' needs), *with* AAH's Response to *Uriel* Plaintiffs' Request for Production No. 34 (agreeing to "produce responsive, non-privileged documents regarding the competitive landscape for Health Care Services . . . in Wisconsin"); AAH's Response to *Uriel* Plaintiffs' Request for Production No. 36 (agreeing to "produce responsive, non-privileged documents regarding providers of Health Care Services . . . in Wisconsin who are not employed by AAH, to the extent that the documents address those providers' prices and quality"). And contrary to your representations, the evidence

1

suggests that the Consumer Insights Network Drive contains a *highly significant* set of responsive documents, as the very first documents we have seen from the drive measure the perception of Aurora as a "must have" hospital system—a characterization that exactly mirrors our complaints' market power allegations, *see Shaw* Complaint ¶¶ 45–47, 91–95; *Uriel* Second Amended Complaint ¶¶ 47–49, 93–97—and the (limited set of) search terms that you have applied to the drive have yielded over 10,000 documents for review.[1]

Our concern has been compounded by the July 31st deposition of Joanne Beck, as corporate representative of UnitedHealthcare. As you know, we have repeatedly requested all documents that underlie any valuations of the All Plans provision conducted by Advocate Aurora and/or its employees. *See, e.g.*, *Uriel* Request for Production No. 38. You have assured us that your relatively sparse productions in response to these requests are complete. *See, e.g.*, Palmer Ltr. of August 1, 2025. But at her deposition, Ms. Beck relayed Mr. Muzi's representation that Advocate Aurora ███████████████████████████████████████████████████████████████ ████████ Joanne Beck Deposition Transcript Rough Draft at 231–32, 309–10. We do not believe that you have produced such an analysis and are thus concerned that you have failed to collect (or preserve) those documents—including from an as-of-yet undisclosed, unsearched non-custodial drive.

As a result of these well-founded concerns, we request that you:

1) prepare Aurora and Advocate Aurora's representatives to testify on the following topic at their upcoming 30(b)(6) depositions: "The steps that You have taken to collect and produce documents responsive to the plaintiffs' document requests in *Uriel Pharm. v. Advocate Aurora Health*, No. 22-cv-610 (E.D. Wis.) and *Shaw v. Advocate Aurora Health*, No. 24-cv-157 (E.D. Wis.), including Your identification of potential sources of responsive documents and Your decisions on whether or not to search such sources." We have enclosed updated 30(b)(6) notices with this topic added.[2]

2) perform a "go get" search for the comprehensive analysis that Mr. Muzi cited to Ms. Beck, and if you still cannot locate that analysis, provide a declaration confirming the same.

We will follow up on your request for Plaintiffs to provide supplemental lists of "non-custodial sources known as likely to contain discoverable ESI" separately. We reserve all rights.

Sincerely,

*/s/ Gregory Dubinsky*
Gregory Dubinsky

CC (via email):      All counsel of record

---

[1] It does not escape us that the even-more-limited set of terms that you initially offered were plainly insufficient to address our concerns. As you know, your list inexplicably limited the responsive universe to documents that contain the word stem "compet*" and would have failed to capture even the aforementioned documents.

[2] Alternatively, we would accept a separate deposition of a records custodian who can speak to the same topic.



# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

PATRICK SHAW, *et al.*,

        Plaintiffs,

  v.

ADVOCATE AURORA HEALTH, INC., *et al.*,     Case No. 2:24-cv-00157-LA

        Defendants.

---

## PLAINTIFFS' NOTICE OF RULE 30(B)(6)

## DEPOSITION OF DEFENDANT AURORA HEALTH CARE, INC.

---

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, on a mutually agreeable date, counsel for Plaintiffs will take the deposition(s) of the designated representative(s) of Defendant Aurora Health Care, Inc. (together with Defendant Advocate Aurora Health, Inc., "AAH"). In accordance with Rule 30(b)(6), Defendant shall designate one or more officers, directors, managing agents, or other individuals who can testify on its behalf regarding the matters set forth below. The individual(s) so designated shall testify fully as to matters known or reasonably available to Defendant.

The deposition may be recorded by any means permitted under the Federal Rules of Civil Procedure, including videotaping and stenographic recording, and will continue from day to day until completed. The deposition may be used at trial or any other proceeding in the above-captioned case in any circumstance authorized by the Federal Rules of Civil Procedure. All counsel of record are invited to attend and participate.

By August 15, 2025, AAH shall provide a written designation of the name(s) and position(s) of the one or more officers, directors, managing agents, or other person(s) who will be produced to testify on Defendant's behalf concerning the topics and matters set forth below.

## DEFINITIONS

1. "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all modifications and amendments thereto.

2. "Allowed Amount" means the maximum amount a Payer will pay for a covered Health Care Service.

3. "AAH" means Aurora Health Care, Inc. and Advocate Aurora Health, Inc. collectively, and includes all owned, affiliated, or allied Medical Facilities and Health Care professionals, and all of AAH's divisions, departments, wholly owned or controlled subsidiaries or affiliates, other subsidiaries, parents, joint ventures, branches, predecessors in interest, successors in interest, current and former Employees, agents, attorneys, or representatives, and all other Persons acting on behalf of, or at the direction of, any such entity. For the avoidance of doubt, AAH also includes its subsidiary Advocate Health Care from the date of its acquisition on April 1, 2018 to present.

4. "AAH Provider" means any provider of Health Care Services (including, but not limited to, doctors, nurses, or advanced practitioners) who is either employed by AAH or who is an Affiliated Provider of AAH.

5. "All Plans Language" refers to provisions requiring, in any Network offered by Payers, (a) that AAH be included and/or permitted to fully participate in all Networks that Payers offer or offered; (b) that Payers would not penalize Members, financially or otherwise, for utilizing AAH and that they would not provide financial or other incentives to clients for utilizing a Provider other than AAH; (c) that Payers do not disclose specific contract terms to commercial Health Plans, including as the term is used in , for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

6. "Chargemaster Rates" means the collection of standard list prices for medical services offered at a Medical Facility, such as a hospital.

7. "Competitor" means any provider of Health Care Services operating in the Market who is not part of AAH.

8. "Contracted Rates" means the total amount (including cost sharing) that a Health Plan or Payer has contractually agreed to pay a participating provider or facility for covered items and services, including through a third-party administrator ("TPA") or pharmacy benefit manager ("PBM").

9. "Demand" means any measure of patient's desire to purchase, or actual purchase and utilization of, Health Care Service provided by AAH and the associated prices charged by AAH, whether in isolation or in comparison to Competitors, including any changes over the relevant time period and in any Market and AAH's evaluation of the foregoing.

10. "Employee" means, without limitation, any current or former officer, director, executive, manager, staff member, agent or other Person performing work on a salaried, hourly, independent contractor, or other basis.

11. "Health Care Services" or "Health Care" means any medical, clinical, laboratory, or therapeutic services provided to any patient by any Medical Facility or Employee of any Medical Facility, including doctors, nurses, and/or advanced practitioners.

12. "Health Plan" means commercial or self-insured health insurance products offered in the individual, group, fully insured, and self-funded health insurance markets, and plans denominated as "PPO," "HMO," "POS," "HDHP," or otherwise.

13. "Including" is used to illustrate a Request with particular types of documents requested and should not be construed as limiting the Request in any way.

14. "Market" means the specific area of economic activity in which AAH competes, encompassing both the products and/or services offered by AAH and the geographic area within Wisconsin where those products and/or services are offered.

15. "Market Power" means AAH's ability to profitably raise prices above levels that would exist or previously existed in a competitive Market or otherwise restrict output for a sustained period in a Market, whether in isolation or in comparison to Competitors.

16. "Medical Facility" means any location or building, such as a hospital, that provides (a) Inpatient Services requiring a patient's overnight stay, and/or (b) Outpatient Services that do not require an overnight stay.

17. "Member" means any person enrolled in a Health Plan whose fees for Health Care Services are paid in whole or in part through commercial health insurance.

18. "Narrow Network" means a type of Health Plan that requires Members to receive Health Care in their Provider Network of doctors, hospitals, Outpatient facilities, or laboratories to receive insurance discounts. If a Member with a Narrow Network Health Plan receives Health Care outside of their Provider Network, they are responsible to pay for the full cost of their Health Care.

19. "Network" means the facilities, providers, and suppliers a Payer has an Agreement with to provide Health Care Services.

20. "Network Adequacy Requirements" means requirements that reflect a Payer's ability to deliver the benefits promised by providing reasonable access to Health Care Services included under the terms of the contract.

21. "Network Participation Agreements" means Agreements with Provider Networks to bring their services and/or facilities into a Network.

22. "Non-Participating Rate" means the rate charged by any Health Care Provider that is not in-network or does not participate in a Health Plan's product or Provider Network.

23. "Payer" means any entity that pays for Health Care Services for any patient, including commercial insurance providers (e.g., Blue Cross, United, Cigna, or Aetna) and self-insured entities.

24. "Person" includes, without limitation, any natural person, corporation, partnership, government entity, and any other form of legal or business entity.

25. "Pricing" includes, without limitation, health claims Data, including billing related information (e.g. billing codes, claim codes, billing information or claims information that a physician, pharmacy, hospital, or other Health Care provider submits to an insurance company relating to the diagnoses, procedures, drugs, or other treatment a patient receives), and any contract or payment-related information (e.g. information tracking the contracting entity and/or paying entity and any payments received, including but not limited to any billing dispute, any tracking of payments, or adjustments made for any reason to payments).

26. "Provider" means an individual or group of individuals who provides health care services.

27. "Provider Network" means a list of Health Care providers, such as hospitals or doctors, that Payers contract with to provide Health Care Services to its Members as "in-network" Providers.

28. "Relating to," "referring to," "regarding," or "with respect to" mean without limitation discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, concerning, containing, mentioning, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting or otherwise involving, in whole or in part.

29. "Steering" means any way in which a Payer or its Employees incentivize or encourage an insured Member to utilize different Health Care options or inform any insured Member of the availability, cost, or benefit of different Health Care options. Examples of Steering Restrictions include restrictions on Narrow Networks, Tiered Networks, and discounts provided to Members to encourage them to visit lower priced providers.

30. "Subscriber" means any Person contracting with a Payer on behalf of Members. Subscribers include entities who negotiate on behalf of their Employees.

31. "Tiered Network" means a Health Plan that divides Health Care providers into levels, or "tiers," based on the value of Health Care that they provide, considering quality and cost of care. The Health Care providers that deliver care that is high value (lower cost and higher quality) are in the highest tier.

32. "You" or "Your" means your organization and its predecessors, successors, subsidiaries, departments, divisions, affiliates, and/or agents (including, without limitation, any third-party recruiting, hiring, or headhunting firm), together with all present and former directors, officers, Employees, Agents, representatives, or any Persons acting or purporting to act on behalf of You.

## RELEVANT TIME PERIOD

1. The Relevant Time Period of the Matters Designated for Examination is from 2004 through the present.

## MATTERS DESIGNATED FOR EXAMINATION

1. The Agreements discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732[1]; Your negotiations relating to those Agreement; and whether there is "All Plans Language" in any other Agreements with Payers.

2. How You set Contracted Rates for the Payers Anthem, United, Humana, Cigna, Common Ground, and Molina, (*i.e.*, the entities whose Agreements are discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732); which Payers, if any, pay Chargemaster Rates; and Your considerations in setting Contracted Rates as compared to Chargemaster Rates.

3. Whether You approved the Agreements discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732.

4. Your assessment of the economic value, competitive effects (including the effects on Competitors), and impact on quality, if any, of the following contractual language in the Agreements discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732: (1) provisions referred to as "All Plans Language" ; (2) the duration and cancellation provisions of those Agreements; and (3) "[a]nnual inflators at ▆▆▆▆▆▆ for broad Commercial networks" as discussed at AAHEDWI00450955.

5. The reasons why AAH "amended all major payor contracts to remove" (as stated at Bates number AAHEDWI00630689) Agreement provisions containing "All Plans Language" as used in, for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

---

[1] Certain portions of those Agreements are identified by AAH with the following Bates numbers from a different matter: AAHVAL.00524, AAH.VAL.00850-51, AAH-00621096, AAH.VAL.00531-32, AAH-00621097, AAH.VAL.02087, AAH-00621056-57, AAH.VAL.01110, AAH.VAL.01281, AAH-00621054, AAH.VAL.01095, AAH-00621054, AAH.VAL.01296, AAH.VAL.00875-76, AAH-00621072, AAHVAL.00875-76, AAH-00578084, AAH-00621082-83, AAH-00577853, AAH-00621068.

6. AAH's decision in or around 2021 to place "AAH's Wisconsin Managed Care contracting team . . . under new leadership" including but not limited to the circumstances surrounding the departure of "Titus Muzi, the former SVP for Managed Care Strategy, [who] left AAH in May 2021", as described in AAHEDWI00630685 at '696.

7. The effects of Agreements that limit AAH Providers' ability to work for Competitors in Wisconsin or to open independent practices on barriers to entry for a provider of Health Care Services in geographic regions in which You operate from 2015 to the present.

8. Your assessment of whether the removal by 2021 of "All Plans Language" requirements or provisions, as discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732, affected the quality of Health Care Services provided by AAH in Wisconsin.

9. Your analysis, assessment, and/or evaluation of (a) Your market share and Market Power; (b) the identity of Your Competitors; (c) the manner in which You define the geographic regions in which You operate; (d) Your Pricing with respect to Health Care Services, including relative to Your Competitors; and (e) the state of competition between You and Your Competitors.

10. The overall costs associated with opening a Medical Facility in the Aurora Service Area, as defined at AAHEDWI02259293 (including the costs described in the press releases available at https://www.aurorahealthcare.org/news/aurora-medical-center-fond-du-lac-now-open, https://www.aurorahealthcare.org/news/aurora-health-care-announces-plans-to-build-ambulatory-surgery-center-physician-office-building-in-pleasant-prairie, and https://www.aurorahealthcare.org/news/advocate-aurora-health-celebrates-construction-of-new-aurora-medical-center-sheboygan-county), and AAH's knowledge of any new or existing Competitor's potential entry into the Aurora Service Area, as defined at AAHEDWI02259293, from 2012 to the present.

11. Any complaints, concerns, or objections conveyed by the Payers Anthem, United, Humana, Cigna, Common Ground, and Molina, (*i.e.*, the entities whose Agreements are discussed at Bates numbers AAHEDWI00630705- AAHEDWI00630732) concerning "All Plans Language" as used in, for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

12. Your knowledge of whether Payers desired to engage in Steering or to offer Tiered Networks.

13. AAH's analysis and evaluation of the merger between Advocate Health Care and Aurora Health Care, including but not limited to AAH's analysis and evaluation of the (a) impact of the mergers on AAH and any of its predecessor entities, (b) AAH's reasoning behind and justifications for the mergers, (c) value of Advocate Health Care and Aurora Health Care, (d) potential efficiencies to be gained through the mergers, and (e) anticipated competitive effects of the mergers.

14. Aurora's enforcement of "All Plans" requirements or other contractual terms that, for example, formed the basis for the claims it filed in *Aurora Health Care, Inc. v. Wisconsin Physician Service Insurance Corporation*, Wis. Cir. Ct. 2005, Case No. 05-CV-11279.

15. AAH's financial performance from 2000 to 2006 and 2016 to the present, including but not limited to AAH's (a) revenue, (b) profits, (c) profit margins, and (d) how these financial metrics changed over time.

16. AAH's financial targets from 2000 to 2006 and 2016 to the present and anticipated future financial performance, including but not limited to AAH's (a) revenue targets, (b) profit targets, (c) profit margin targets, and (d) how these financial targets were set and changed over time.

17. AAH's communications and interactions with the Federal Trade Commission, the United States Department of Justice, and the Wisconsin Attorney General's Office concerning (a) Your Market Power in the Aurora Service Area, as defined at AAHEDWI02259293, (b) Your market share in the Aurora Service Area, as defined at AAHEDWI02259293, and (c) the "All Plans Language" as used in, for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

18. AAH's decision on whether to abide by or otherwise apply the terms of the settlement between the United States Department of Justice and AAH predecessor entity Atrium Health (*see U.S. v. The Charlotte-Mecklenburg Hospital Authority*, 3:16-cv-00311-RJC-DCK, Dkt. 87) to AAH's operations in Wisconsin.

19. The steps that You have taken to collect and produce documents responsive to the plaintiffs' document requests in *Uriel Pharm. v. Advocate Aurora Health*, No. 22-cv-610 (E.D. Wis.) and *Shaw v. Advocate Aurora Health*, No. 24-cv-157 (E.D. Wis.), including Your identification of potential sources of responsive documents and Your decisions on whether or not to search such sources.

Dated: August 8, 2025

Douglas M. Poland
Erin K. Deeley
David P. Hollander
Mason A. Higgins

**STAFFORD ROSENBAUM LLP**

222 West Washington Avenue, Suite 900
Madison, WI 53703
Tel: (608) 256-0226
dpoland@staffordlaw.com
edeeley@staffordlaw.com
dhollander@staffordlaw.com
mhiggins@staffordlaw.com

*/s/ Gregory J. Dubinsky*
Vincent Levy
Gregory J. Dubinsky
Kevin D. Benish
Jonathon R. La Chapelle
Jack L. Millman
Byron J. Hazzard
Andrew D. Sgarro

**HOLWELL SHUSTER & GOLDBERG LLP**

425 Lexington Ave., 14th Floor
New York, New York 10017
Tel: (646) 837-5151
Email: vlevy@hsgllp.com
gdubinsky@hsgllp.com
kbenish@hsgllp.com
jlachapelle@hsgllp.com
jmillman@hsgllp.com
bhazzard@hsgllp.com
asgarro@hsgllp.com

*Attorneys for Plaintiffs*



# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

PATRICK SHAW, *et al.*,

                Plaintiffs,

      v.

ADVOCATE AURORA HEALTH, INC., *et al.*,      Case No. 2:24-cv-00157-LA

                Defendants.

## PLAINTIFFS' NOTICE OF RULE 30(B)(6)

## DEPOSITION OF DEFENDANT ADVOCATE AURORA HEALTH, INC.

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, on a mutually agreeable date, counsel for Plaintiffs will take the deposition(s) of the designated representative(s) of Defendant Advocate Aurora Health, Inc. (together with Defendant Aurora Health Care, Inc., "AAH"). In accordance with Rule 30(b)(6), Defendant shall designate one or more officers, directors, managing agents, or other individuals who can testify on its behalf regarding the matters set forth below. The individual(s) so designated shall testify fully as to matters known or reasonably available to Defendant.

The deposition may be recorded by any means permitted under the Federal Rules of Civil Procedure, including videotaping and stenographic recording, and will continue from day to day until completed. The deposition may be used at trial or any other proceeding in the above-captioned case in any circumstance authorized by the Federal Rules of Civil Procedure. All counsel of record are invited to attend and participate.

By August 15, 2025, AAH shall provide a written designation of the name(s) and position(s) of the one or more officers, directors, managing agents, or other person(s) who will be produced to testify on Defendant's behalf concerning the topics and matters set forth below.

## **DEFINITIONS**

1. "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all modifications and amendments thereto.

2. "Allowed Amount" means the maximum amount a Payer will pay for a covered Health Care Service.

3. "AAH" means Aurora Health Care, Inc. and Advocate Aurora Health, Inc. collectively, and includes all owned, affiliated, or allied Medical Facilities and Health Care professionals, and all of AAH's divisions, departments, wholly owned or controlled subsidiaries or affiliates, other subsidiaries, parents, joint ventures, branches, predecessors in interest, successors in interest, current and former Employees, agents, attorneys, or representatives, and all other Persons acting on behalf of, or at the direction of, any such entity. For the avoidance of doubt, AAH also includes its subsidiary Advocate Health Care from the date of its acquisition on April 1, 2018 to present.

4. "AAH Provider" means any provider of Health Care Services (including, but not limited to, doctors, nurses, or advanced practitioners) who is either employed by AAH or who is an Affiliated Provider of AAH.

5. "All Plans Language" refers to provisions requiring, in any Network offered by Payers, (a) that AAH be included and/or permitted to fully participate in all Networks that Payers offer or offered; (b) that Payers would not penalize Members, financially or otherwise, for utilizing AAH and that they would not provide financial or other incentives to clients for utilizing a Provider other than AAH; (c) that Payers do not disclose specific contract terms to commercial Health Plans, including as the term is used in , for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

6. "Chargemaster Rates" means the collection of standard list prices for medical services offered at a Medical Facility, such as a hospital.

7. "Competitor" means any provider of Health Care Services operating in the Market who is not part of AAH.

8. "Contracted Rates" means the total amount (including cost sharing) that a Health Plan or Payer has contractually agreed to pay a participating provider or facility for covered items and services, including through a third-party administrator ("TPA") or pharmacy benefit manager ("PBM").

9. "Demand" means any measure of patient's desire to purchase, or actual purchase and utilization of, Health Care Service provided by AAH and the associated prices charged by AAH, whether in isolation or in comparison to Competitors, including any changes over the relevant time period and in any Market and AAH's evaluation of the foregoing.

10. "Employee" means, without limitation, any current or former officer, director, executive, manager, staff member, agent or other Person performing work on a salaried, hourly, independent contractor, or other basis.

11. "Health Care Services" or "Health Care" means any medical, clinical, laboratory, or therapeutic services provided to any patient by any Medical Facility or Employee of any Medical Facility, including doctors, nurses, and/or advanced practitioners.

12. "Health Plan" means commercial or self-insured health insurance products offered in the individual, group, fully insured, and self-funded health insurance markets, and plans denominated as "PPO," "HMO," "POS," "HDHP," or otherwise.

13. "Including" is used to illustrate a Request with particular types of documents requested and should not be construed as limiting the Request in any way.

14. "Market" means the specific area of economic activity in which AAH competes, encompassing both the products and/or services offered by AAH and the geographic area within Wisconsin where those products and/or services are offered.

15. "Market Power" means AAH's ability to profitably raise prices above levels that would exist or previously existed in a competitive Market or otherwise restrict output for a sustained period in a Market, whether in isolation or in comparison to Competitors.

16. "Medical Facility" means any location or building, such as a hospital, that provides (a) Inpatient Services requiring a patient's overnight stay, and/or (b) Outpatient Services that do not require an overnight stay.

17. "Member" means any person enrolled in a Health Plan whose fees for Health Care Services are paid in whole or in part through commercial health insurance.

18. "Narrow Network" means a type of Health Plan that requires Members to receive Health Care in their Provider Network of doctors, hospitals, Outpatient facilities, or laboratories to receive insurance discounts. If a Member with a Narrow Network Health Plan receives Health Care outside of their Provider Network, they are responsible to pay for the full cost of their Health Care.

19. "Network" means the facilities, providers, and suppliers a Payer has an Agreement with to provide Health Care Services.

20. "Network Adequacy Requirements" means requirements that reflect a Payer's ability to deliver the benefits promised by providing reasonable access to Health Care Services included under the terms of the contract.

21. "Network Participation Agreements" means Agreements with Provider Networks to bring their services and/or facilities into a Network.

22. "Non-Participating Rate" means the rate charged by any Health Care Provider that is not in-network or does not participate in a Health Plan's product or Provider Network.

23. "Payer" means any entity that pays for Health Care Services for any patient, including commercial insurance providers (e.g., Blue Cross, United, Cigna, or Aetna) and self-insured entities.

24. "Person" includes, without limitation, any natural person, corporation, partnership, government entity, and any other form of legal or business entity.

25. "Pricing" includes, without limitation, health claims Data, including billing related information (e.g. billing codes, claim codes, billing information or claims information that a physician, pharmacy, hospital, or other Health Care provider submits to an insurance company relating to the diagnoses, procedures, drugs, or other treatment a patient receives), and any contract or payment-related information (e.g. information tracking the contracting entity and/or paying entity and any payments received, including but not limited to any billing dispute, any tracking of payments, or adjustments made for any reason to payments).

26. "Provider" means an individual or group of individuals who provides health care services.

27. "Provider Network" means a list of Health Care providers, such as hospitals or doctors, that Payers contract with to provide Health Care Services to its Members as "in-network" Providers.

28. "Relating to," "referring to," "regarding," or "with respect to" mean without limitation discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, concerning, containing, mentioning, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting or otherwise involving, in whole or in part.

29. "Steering" means any way in which a Payer or its Employees incentivize or encourage an insured Member to utilize different Health Care options or inform any insured Member of the availability, cost, or benefit of different Health Care options. Examples of Steering Restrictions include restrictions on Narrow Networks, Tiered Networks, and discounts provided to Members to encourage them to visit lower priced providers.

30. "Subscriber" means any Person contracting with a Payer on behalf of Members. Subscribers include entities who negotiate on behalf of their Employees.

31. "Tiered Network" means a Health Plan that divides Health Care providers into levels, or "tiers," based on the value of Health Care that they provide, considering quality and cost of care. The Health Care providers that deliver care that is high value (lower cost and higher quality) are in the highest tier.

32. "You" or "Your" means your organization and its predecessors, successors, subsidiaries, departments, divisions, affiliates, and/or agents (including, without limitation, any third-party recruiting, hiring, or headhunting firm), together with all present and former directors, officers, Employees, Agents, representatives, or any Persons acting or purporting to act on behalf of You.

### RELEVANT TIME PERIOD

1. The Relevant Time Period of the Matters Designated for Examination is from 2004 through the present.

### MATTERS DESIGNATED FOR EXAMINATION

1. The Agreements discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732[1]; Your negotiations relating to those Agreement; and whether there is "All Plans Language" in any other Agreements with Payers.

2. How You set Contracted Rates for the Payers Anthem, United, Humana, Cigna, Common Ground, and Molina, (*i.e.*, the entities whose Agreements are discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732); which Payers, if any, pay Chargemaster Rates; and Your considerations in setting Contracted Rates as compared to Chargemaster Rates.

3. Whether You approved the Agreements discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732.

4. Your assessment of the economic value, competitive effects (including the effects on Competitors), and impact on quality, if any, of the following contractual language in the Agreements discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732: (1) provisions referred to as "All Plans Language" ; (2) the duration and cancellation provisions of those Agreements; and (3) "[a]nnual inflators at ███████ for broad Commercial networks" as discussed at AAHEDWI00450955.

5. The reasons why AAH "amended all major payor contracts to remove" (as stated at Bates number AAHEDWI00630689) Agreement provisions containing "All Plans Language" as used in, for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

---

[1] Certain portions of those Agreements are identified by AAH with the following Bates numbers from a different matter: AAHVAL.00524, AAH.VAL.00850-51, AAH-00621096, AAH.VAL.00531-32, AAH-00621097, AAH.VAL.02087, AAH-00621056-57, AAH.VAL.01110, AAH.VAL.01281, AAH-00621054, AAH.VAL.01095, AAH-00621054, AAH.VAL.01296, AAH.VAL.00875-76, AAH-00621072, AAHVAL.00875-76, AAH-00578084, AAH-00621082-83, AAH-00577853, AAH-00621068.

6. AAH's decision in or around 2021 to place "AAH's Wisconsin Managed Care contracting team . . . under new leadership" including but not limited to the circumstances surrounding the departure of "Titus Muzi, the former SVP for Managed Care Strategy, [who] left AAH in May 2021", as described in AAHEDWI00630685 at '696.

7. The effects of Agreements that limit AAH Providers' ability to work for Competitors in Wisconsin or to open independent practices on barriers to entry for a provider of Health Care Services in geographic regions in which You operate from 2015 to the present.

8. Your assessment of whether the removal by 2021 of "All Plans Language" requirements or provisions, as discussed at Bates numbers AAHEDWI00630705-AAHEDWI00630732, affected the quality of Health Care Services provided by AAH in Wisconsin.

9. Your analysis, assessment, and/or evaluation of (a) Your market share and Market Power; (b) the identity of Your Competitors; (c) the manner in which You define the geographic regions in which You operate; (d) Your Pricing with respect to Health Care Services, including relative to Your Competitors; and (e) the state of competition between You and Your Competitors.

10. The overall costs associated with opening a Medical Facility in the Aurora Service Area, as defined at AAHEDWI02259293 (including the costs described in the press releases available at https://www.aurorahealthcare.org/news/aurora-medical-center-fond-du-lac-now-open, https://www.aurorahealthcare.org/news/aurora-health-care-announces-plans-to-build-ambulatory-surgery-center-physician-office-building-in-pleasant-prairie, and https://www.aurorahealthcare.org/news/advocate-aurora-health-celebrates-construction-of-new-aurora-medical-center-sheboygan-county), and AAH's knowledge of any new or existing Competitor's potential entry into the Aurora Service Area, as defined at AAHEDWI02259293, from 2012 to the present.

11. Any complaints, concerns, or objections conveyed by the Payers Anthem, United, Humana, Cigna, Common Ground, and Molina, (*i.e.*, the entities whose Agreements are discussed at Bates numbers AAHEDWI00630705- AAHEDWI00630732) concerning "All Plans Language" as used in, for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

12. Your knowledge of whether Payers desired to engage in Steering or to offer Tiered Networks.

13. AAH's analysis and evaluation of the merger between Advocate Health Care and Aurora Health Care, including but not limited to AAH's analysis and evaluation of the (a) impact of the mergers on AAH and any of its predecessor entities, (b) AAH's reasoning behind and justifications for the mergers, (c) value of Advocate Health Care and Aurora Health Care, (d) potential efficiencies to be gained through the mergers, and (e) anticipated competitive effects of the mergers.

14. Aurora's enforcement of "All Plans" requirements or other contractual terms that, for example, formed the basis for the claims it filed in *Aurora Health Care, Inc. v. Wisconsin Physician Service Insurance Corporation*, Wis. Cir. Ct. 2005, Case No. 05-CV-11279.

15. AAH's financial performance from 2000 to 2006 and 2016 to the present, including but not limited to AAH's (a) revenue, (b) profits, (c) profit margins, and (d) how these financial metrics changed over time.

16. AAH's financial targets from 2000 to 2006 and 2016 to the present and anticipated future financial performance, including but not limited to AAH's (a) revenue targets, (b) profit targets, (c) profit margin targets, and (d) how these financial targets were set and changed over time.

17. AAH's communications and interactions with the Federal Trade Commission, the United States Department of Justice, and the Wisconsin Attorney General's Office concerning (a) Your Market Power in the Aurora Service Area, as defined at AAHEDWI02259293, (b) Your market share in the Aurora Service Area, as defined at AAHEDWI02259293, and (c) the "All Plans Language" as used in, for example, AAHEDWI00046685, AAHEDWI00516963, and AAHEDWI00435293.

18. AAH's decision on whether to abide by or otherwise apply the terms of the settlement between the United States Department of Justice and AAH predecessor entity Atrium Health (*see U.S. v. The Charlotte-Mecklenburg Hospital Authority*, 3:16-cv-00311-RJC-DCK, Dkt. 87) to AAH's operations in Wisconsin.

19. The steps that You have taken to collect and produce documents responsive to the plaintiffs' document requests in *Uriel Pharm. v. Advocate Aurora Health*, No. 22-cv-610 (E.D. Wis.) and *Shaw v. Advocate Aurora Health*, No. 24-cv-157 (E.D. Wis.), including Your identification of potential sources of responsive documents and Your decisions on whether or not to search such sources.

Dated: August 8, 2025

| | |
|---|---|
| | /s/ *Gregory J. Dubinsky* |
| Douglas M. Poland | Vincent Levy |
| Erin K. Deeley | Gregory J. Dubinsky |
| David P. Hollander | Kevin D. Benish |
| Mason A. Higgins | Jonathon R. La Chapelle |
| | Jack L. Millman |
| **STAFFORD ROSENBAUM LLP** | Byron J. Hazzard |
| 222 West Washington Avenue, Suite 900 | Andrew D. Sgarro |
| Madison, WI 53703 | |
| Tel: (608) 256-0226 | **HOLWELL SHUSTER & GOLDBERG LLP** |
| dpoland@staffordlaw.com | 425 Lexington Ave., 14th Floor |
| edeeley@staffordlaw.com | New York, New York 10017 |
| dhollander@staffordlaw.com | Tel: (646) 837-5151 |
| mhiggins@staffordlaw.com | Email: vlevy@hsgllp.com |
| |       gdubinsky@hsgllp.com |
| |       kbenish@hsgllp.com |
| |       jlachapelle@hsgllp.com |
| |       jmillman@hsgllp.com |
| |       bhazzard@hsgllp.com |
| |       asgarro@hsgllp.com |

*Attorneys for Plaintiffs*